**IN THE COURT OF APPEALS OF IOWA**

No. 17-1289
Filed November 8, 2017

**IN THE INTEREST OF K.E.,**
**Minor Child,**

**C.E., Father,**
       Appellant,

**R.E., Mother,**
       Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Jennifer S.

Bailey, District Associate Judge.

A mother and father appeal separately the termination of their parental

rights to their child. **AFFIRMED ON BOTH APPEALS.**

Shane M. Wiley of Hirsch, Adams, Putnam, Cahill & Wiley, P.L.C., West

Burlington, for appellant father.

Heidi D. Van Winkle of Van Winkle Law Office, Burlington, for appellant

mother.

Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney

General, for appellee.

Joshua P. Schier of Cray Law Firm, P.C., Burlington, guardian ad litem for

minor child.

Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

The mother and father appeal separately the termination of their parental rights to their child, K.E., born in September 2015. Both parents' rights were terminated pursuant to Iowa Code section 232.116(1)(h) (2017). Both parents argue there is not clear and convincing evidence to support the statutory grounds for termination and termination is not in K.E.'s best interests.

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) became involved with the family shortly after the child's birth due to concerns the parents were unable to care for him. The mother had suffered a head injury at age three and continues to have issues with her short-term memory as a result. The father suffers from a seizure disorder and also has issues with memory.

The family received daily safety services for four weeks in October 2015, with providers coming into the family home each day for hands-on interactions. Even after several repetitions, service providers reported to DHS the parents were still unable to correctly prepare bottles for K.E. and they were not feeding him the appropriate amounts. The providers also had concerns the parents were unable to read K.E.'s cues in regards to eating, sleeping, and needing his diaper changed. There were medical concerns about K.E. losing, rather weight.

In late October, DHS became aware of a video posted to the father's social media account. According to a report from DHS,[1] the video showed the father lifting K.E. by his legs and the father using his hands to aggressively shake

---

[1] DHS informed the court of the video and its content in an affidavit. It is unclear if the court ever reviewed the video, and we do not have a copy of the video in our record.

K.E.'s chest and rotate K.E.'s arms and legs. DHS filed for the immediate removal of K.E. from his parents' care, and the court granted the request. K.E. was placed in the care of a foster family.

Following K.E.'s removal, the parents were responsive to the idea of participating in more services, with the father admitting he has an anger issue and both parents agreeing they would benefit from classes on parenting skills.

Upon the court's order, the parents each completed mental-health evaluations. Testing indicated both parents were in need of intensive training on parenting skills. The mother's results showed she had a cognitive level of a third to fifth grader and a number of severe impairments. The father exhibited difficulty with memory, judgment, and reasoning, and he was determined to have "significant impairment in mental status." Based on the results of the evaluations and the parents' own reports, providers continued to use repetitive, hands-on training with the parents. Several of the providers focused on helping the parents understand K.E.'s nutritional needs and the idea of feeding him on a schedule.

In April 2016, the social worker advised the court she believed the parents should be given an additional six months before the court moved to permanency, so they could have more time to develop their parenting skills. The court ordered a six-month extension for the permanency hearing; K.E. remained in the care of a foster family.

In September, visits were changed to semi-supervised. The parents and foster parents exchanged a book back and forth that indicated the child's schedule for eating and napping. The goal was for the child to keep the same schedule at both locations. While at the foster parents' home, K.E. would awake

at approximately 8:00 a.m. and eat cereal with six ounces of milk in a sippy cup. K.E. would be given a fruit and a six-ounce bottle at 11:00 a.m. and a six-ounce bottle at 2:00 p.m. His evening schedule included a vegetable and six ounces of milk for dinner, around 5:00 p.m., and then an eight-ounce bottle before bed at 9:00 p.m. When K.E. was in his parents' care for semi-supervised visits, it was noted he was receiving only six to nine ounces of food or milk for a day. When asked, the parents stated K.E. was not hungry. Providers attempted to go over an appropriate feeding schedule with the parents a number of times, but the parents were still unable to report how much K.E. should be eating or when. The parents also self-reported struggles with retaining the information.

Due to concerns the parents could not meet K.E.'s nutritional needs when the child was left with the parents for a number of hours, visits returned to being fully supervised after a few weeks. They remained fully supervised, with the parents receiving a myriad of services, until the time of the termination hearing, in July 2017.

At the hearing, all parties recognized the amount of effort the parents had put toward learning new skills so K.E. could be returned to their care. Additionally, everyone recognized how much each parent loves K.E. However, due to ongoing concerns K.E. would be in danger of neglect and harmful effects as a result of the parents' failure to exercise a reasonable degree of care in supervising the child, the court terminated both parents' rights pursuant to Iowa Code section 232.116(1)(h).

The mother and father appeal separately.

**II. Standard of Review.**

We review termination-of-parental-rights proceedings de novo. *In re P.L.,* 778 N.W.2d 33, 40 (Iowa 2010). "Grounds for termination must be proven by clear and convincing evidence" and "[o]ur primary concern is the best interests of the child." *In re J.E.,* 723 N.W.2d 793, 798 (Iowa 2006).

**III. Discussion.**

**A. Statutory Grounds.**

Both parents contest only the fourth element of section 232.116(1)(h)—the juvenile court's determination K.E. could not be returned home at the time of the termination hearing without being at risk of further adjudicatory harm. The parents were able to learn many of the necessary skills to care for K.E. as an infant, but, using the past as an indicator for future performance, there is clear and convincing evidence they will not be able to anticipate his changing needs as he grows. *See In re C.K.,* 558 N.W.2d 170, 172 (Iowa 1997). Both parents testified they had resources in the community and family members they could go to with questions, but the record suggests being told the information once is not sufficient for the parents to learn it and adapt their behavior accordingly. It took the parents a number of weeks, if not months, of hands-on instruction to learn the proper ratio of formula to water for a bottle. Additionally, DHS and the foster family used a food diary sent back and forth between the parents and foster parents so K.E. could be fed on the same schedule at both homes; the parents were unable to recognize the pattern of the schedule and feed K.E. accordingly, and he was being returned to the foster parents hungry. Lack of understanding regarding K.E.'s nutritional needs was an issue at the time of semi-supervised

visits in September 2016 and remained an issue at the time of the termination hearing in July 2017. When asked what type of schedule they would adopt if K.E. was returned to their care, the mother testified she would feed K.E.—who was two years old—cereal or oatmeal for breakfast, then she would "feed him lunch, maybe something light, that way he's not too full by dinnertime," and "something easy" for dinner at "6:30, 7:00."

Additionally, with both parents' struggles with memory issues—especially short-term memory issues—there are concerns they would be unable to appropriately administer medication, either by missing doses or overmedicating. The mother's testimony about losing the inhaler she was prescribed and having missed her prescribed doses for a week supports this concern. While the parents' attorneys implied that K.E. will be able to verbalize his needs and "help" his parents remember things like feedings and medicine as he gets older, we cannot put the onus for appropriate caregiving on the small child.

We agree with the juvenile court that K.E. could not be safely returned to the parents' care at the time of the termination hearing.

**B. Best Interests.**

Both parents also contend termination of their parental rights is not in K.E.'s best interests.

At the time of the termination hearing, K.E. was almost two years old and had been outside of the home since before he was two months old. He had recently begun calling his foster parents, who stated they wished to be considered as a pre-adoptive home, "mom" and "dad." K.E. still exhibited some excitement when he had visits with his parents, but there is nothing in the record

that suggests that bond was so close that termination would be detrimental to K.E. *See* Iowa Code § 232.116(3)(c). It is undisputed the parents love K.E., but as the juvenile court noted, K.E. "would be at risk of injury or death if left alone in their care, despite their unwavering love and their best efforts." Giving "primary consideration to the child's safety"; "to the best placement for furthering the long-term nurturing and growth"; and "to the physical, mental, and emotional needs" of K.E., termination of the parents' parental rights is in his best interests. *See* Iowa Code § 232.116(2).

**AFFIRMED ON BOTH APPEALS.**