# IN THE COURT OF APPEALS OF IOWA

No. 22-1970
Filed March 29, 2023

**IN THE INTEREST OF L.K.,**
**Minor Child,**

**K.D., Mother,**
　　Appellant,

**T.K., Father,**
　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, Kimberly Ayotte, District Associate Judge.

The mother and father appeal from an order terminating their parental rights. **AFFIRMED ON BOTH APPEALS.**

Audra F. Saunders of Anderson & Taylor, PLLC, Des Moines, for appellant mother.

Austin Jungblut of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, L.L.P., Des Moines, for appellant father.

Brenna Bird, Attorney General, and Dion D. Trowers, Assistant Attorney General, for appellee State.

Erin Elizabeth Romar, Des Moines, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The mother and father separately appeal termination of their parental rights. The father only raises a challenge to the statutory basis for termination, while the mother makes several claims. Because these parents cannot provide a safe and stable home, even after years of services, we affirm.

## I.    Background Facts and Proceedings

The child at issue was born in early 2020 to these never-married parents. The child was significantly premature and required an extended stay in the neonatal intensive care unit. When the child was ready for discharge from the hospital, she required specific equipment to monitor her medical status. The family came to the attention of the Iowa Department of Health and Human Services (HHS) shortly after birth,[1] when hospital staff raised concerns the parents were unable or unwilling to meet the child's special medical needs. Specific concerns were raised about the parents not charting feedings, not properly diapering the child, and not using a pulse oxygen monitor (which was medically required). Subsequent home visits revealed the environment posed a risk to the child's health because of pests (including cockroaches), pets (as many as seven cats, three dogs, and a bunny), cleanliness (bugs and mold in the child's sippy cups, feces on the floor), poor child-proofing (unsecured prescription medications and cleaning

---

[1] The mother's history with HHS included termination of her rights to another child, who was removed in 2013 because the mother "lacked the necessary parenting skills to care for [the] child." The mother admitted, under questioning by the State in this proceeding, that many of the same problems that prompted the first termination persisted.

chemicals), and hoarding issues.  The juvenile court also found that the "parents were dishonest with [HHS]" during the investigation and assessments.

In the summer of 2020, the child was adjudicated as a child in need of assistance (CINA) and temporarily removed from the home.  Additional services were provided to the parents, with the aim that they learn how to meet the child's basic and medical needs.  The child was returned to the parents' care in October 2020.

Despite ongoing services, the child's daycare providers reported that the child arrived at daycare in soiled clothing, hungry, and with some combination of formula, possible feces, and mucus on her face.  Conditions in the home would sometimes improve temporarily only for the same or new concerns about safety and cleanliness to re-emerge.

HHS evaluators determined that the father could not provide adequate supervision of the child and required his contact with the child be supervised by another adult.  At the time, the father admitted he could not provide adequate care on his own.  He reported he suffered head injuries as a child and had significant memory problems.  Testing confirmed that the father had "significant problems with attention, concentration, memory, and attention to detail."  The testing also "indicated that [the father] might fail[] to recognize emergent needs, misread behavioral cues, and have difficulty in mastering parenting demands as [the child's] problems became more complex."  The bottom line was that, while the father "clearly loved" the child, he could not parent the child on his own.  In addition to these deficits, the father has trouble with depression, for which he has sought treatment inconsistently.  Based on this constellation of concerns, an assessment

provided to HHS determined that the father posed a "high risk" to the child if he were to parent independently.

The mother has serious health problems of her own, including chronic kidney disease that requires dialysis. She recently had issues managing her health, including a lack of dialysis compliance, which led to her not being placed on the transplant list for a new kidney. She has trouble with some daily activities of living, such as getting up stairs. The mother is also diagnosed with major depressive disorder, generalized anxiety disorder, and borderline personality disorder. She takes medication and attends therapy.

In July 2021, the child was removed from the home a second time and placed with HHS and eventually foster care. A few months later, the family moved into a new residence, only for the same concerns about garbage and cleanliness, an excessive number of pets (more than six), and pests (again cockroaches) to emerge. The family eventually stopped paying rent and moved out of the home, leaving behind unpaid bills and the house "in [a] serious state of neglect and filth." Review hearings continued to confirm the ongoing CINA concern, and a termination trial was held in October 2022.

The child has not been returned to the parents' care since the second removal, and the parents have not progressed beyond supervised visits. Both parents admitted at trial to missing several visits in the months leading up to the proceeding. Despite more than two years of services, both parents still required prompts from providers during visits to do basic parenting—"to stay awake, to supervise [the child], to appropriately care for [the child], and to keep the home clean."

As recently as the weeks before the termination trial, the mother and father were temporarily homeless, unable to pay for the hotel where they had been staying (with two other family members) for the preceding month. In between the stay at the hotel and moving into an apartment, they lived in a vehicle for "a couple nights." Before that, they were kicked out of church-sponsored housing for not paying rent or other debts with the church. (In the years before the termination trial, the church had been helping the family with loans, diapers and other supplies, and transportation.)

The HHS staffer who worked with the family throughout the life of the case opined that both parents often shifted the blame for issues of safety and cleanliness to other family members and failed to take responsibility for their living conditions. In the staffer's words, "this family lacks insight" into why they are struggling, and instead "spend[s] a lot of time defending and denying the issues instead of resolving them." She testified that, based on her lengthy history with the family, there was little to no chance of improvement in another six months, and things may even go downhill because of the family's ongoing issues with housing. She also opined that another six-month delay would harm the child.

The child is placed with a loving family—a local pastor and his wife—where she is thriving.

Following contested trial, the State, HHS, the guardian ad litem, and the court appointed special advocate all recommended termination of both parents' rights. The juvenile court followed the recommendations and terminated the rights of both parents. The mother and father each appeal.

## II.      Standard of Review

"We review termination proceedings de novo." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "The primary interest in termination proceedings is the best interests of the child." *Id.*

## III.      Discussion

Both parents appeal but raise different issues. The father only challenges the statutory elements for termination. The mother makes several challenges, contesting whether termination is in the best interests of the child, whether a statutory exception precluded termination, and whether the State provided reasonable efforts toward reunification. On our de novo review, we reject these arguments and affirm.

### A.  Statutory Elements[2]

The father's challenge on appeal is confined to the fourth and final element of Iowa Code section 232.116(1)(h) (2022), which requires the State to prove by clear and convincing evidence "that the child cannot be returned to the custody of the child's parents" at the time of termination. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (noting the relevant timeframe under the statute is the time of trial). The gist of the father's argument is that he made strides immediately preceding trial toward a better living environment for the child, and he believes the mother's family was to blame for the "cluttering, trash, and hoarding in the prior home," not him. We reject these claims and affirm.

---

[2] The father challenges the grounds for termination, but the mother does not.

While the father made some positive efforts on the eve of termination, this does not materially undercut the overwhelming evidence in the rest of the case file that convinces us the child could not be returned to the father's care. This family's financial and housing instability, problems with cleanliness, and carelessness regarding child safety are longstanding problems that cannot be cured with a last-minute move to a new apartment. And even setting aside the environmental concerns, we are persuaded by the assessment provided to HHS establishing the father was a "high risk" to the child if permitted to independently parent her. In short, the father's memory issues have rendered him unable to independently care for the child without endangering her. Even with supervision, the father has been unable to fully care for the child; without it, there is a real danger the child will be injured or killed through neglect. "[A] parent's lower mental functioning alone is not sufficient grounds for termination. But where it affects the child's well-being, it can be a relevant consideration." *Id.* (internal citation and quotation marks omitted). We find the father's mental functioning is such that he cannot independently care for the child, the child could not be returned to his custody, and we therefore affirm.

## B. Best Interests of the Child

"It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted); *see also* Iowa Code § 232.116(2) (requiring the juvenile court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional

condition and needs of the child"). Yet this is almost precisely what the mother argues in her petition on appeal—that despite all of the well-developed record evidence supporting termination, she will be able to provide a safe home in the future. As our precedent dictates, we give weight to the case history and many reports documenting this family's struggles. *See In re S.N.*, 500 N.W.2d 32, 34 (Iowa 1993). The mother could not provide a safe or stable environment for the child on any consistent basis over the life of the case, and this child need not wait until her "natural parents get their lives together." *A.B.*, 815 N.W.2d at 778 (quoting *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997)). Termination is in the child's best interests.

### C. Additional Time[3]

The mother also argues the juvenile court should have granted her extra time to work toward reunification. *See* Iowa Code § 232.104(2)(b) (allowing the juvenile court to grant an additional six months for reunification, provided the court "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). It would be hard to improve on the juvenile court's analysis of this request:

> The parents have requested a six-month extension. This case has been open since April 2020. The concerns that existed at the outset of this case remain the same today. Permanency was entered on May 23, 2022. Five months have passed. In that time, family interactions have not improved. The family failed to maintain appropriate housing and became homeless. [The mother] and [the father] have just moved into a new apartment. Their [extended] family continues to stay with them. They have not been able to set

---

[3] In the mother's petition on appeal, this issue is intermingled with the best-interests analysis. We address her argument separately.

appropriate boundaries. They have not demonstrated sufficient progress in parenting. Their ability to maintain their housing remains unknown. Based on the progress over the life of this case, the court cannot find that a six-month extension is either likely to result in reunification or in [the child's] best interest.

We agree with these findings and adopt them fully. The parents made little or no progress during the life of this case or the related CINA proceedings, and there is no reason to think another six months would have made a difference.

### D. Permissive Bond Exception

The mother next argues that her bond with the child should preclude termination. *See* Iowa Code § 232.116(3)(c). The mother bore the burden to prove this permissive exception by clear and convincing evidence. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). The juvenile court rejected this argument, and so do we.

We do not doubt the mother loves her child. But a parent's love is not enough to prevent termination, nor is the mere existence of a bond. *See In re A.B.*, 956 N.W.2d 162, 169–70 (Iowa 2021); *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). The record evidence suggests the child is bonded as or more strongly with the foster placement than with the mother, and the foster placement is safe, stable, and caring. In contrast, the instability and lack of insight that has plagued the mother from the prior termination through the present appears to be persistent and grounded in chronic deficits. The mother did not carry her burden to invoke the bond exception to preclude termination.

### E. Reasonable Efforts

Last, the mother argues she was not provided reasonable efforts toward reunification. During the CINA proceeding, the mother filed an application for

reasonable efforts, requesting HHS provide three visits every week. The juvenile court denied her application, finding HHS offered at least that many visits and the mother was late to or entirely missed at least some of these visits. The mother's petition on appeal largely alleges the same deficiencies in visitation.

We are hard-pressed to find any lack of reasonable efforts when the mother herself admitted to missing multiple visits, and failing to confirm others, as recently as the months just before termination. This alone defeats the mother's challenge. *See In re C.P.*, No. 18-1536, 2018 WL 6131242, at *3 (Iowa Ct. App. Nov. 21, 2018) (collecting cases for the proposition that "failure to use the services provided defeats [a parent's] reasonable-efforts claim").

Assuming we need to conduct any further analysis, the juvenile court here correctly identified that the family had been provided significant services: "prior CINA services; child protective assessment services; kinship placement; foster care; individual therapy; Family Centered Services; Solution Focused Meetings; psychological evaluations; staffings; family therapy; family interactions; Solution Based Casework; in-home nursing services; Gold Circle services; referrals for SSI; parenting assessments; financial assistance; paternity testing; and SafeCare." The services offered meet or exceed what would be reasonable under the circumstances of this case. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). And the visitation offered was reasonable considering the comprehensive services supporting reunification. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) ("Visitation . . . cannot be considered in a vacuum. It is only one element in what is often a comprehensive, interdependent approach to reunification. If services directed at removing the risk or danger responsible for a

limited visitation scheme have failed its objective, increased visitation would most likely not be in the child's best interests."). We affirm the juvenile court's denial of the mother's reasonable-efforts challenge.

**IV.     Conclusion**

Having rejected the father's challenge to the statutory grounds for termination and the mother's various challenges to other aspects of the proceedings, we affirm termination of both parents' parental rights.

**AFFIRMED ON BOTH APPEALS.**