In the Interest of C.K., A Minor Child, J.K., Mother, and D.K., Father, Appellants,

State of Iowa, Appellee.

No. 95–1848.

Supreme Court of Iowa.

Jan. 22, 1997.

Gary L. Mick of Schuster & Mick, Guttenberg, for appellant mother.

Jeffrey E. Clements, West Union, for appellant father.

Thomas J. Miller, Attorney General, Diane Stahle, Special Assistant Attorney General, Maureen McGuire, Assistant Attorney General, and Stephen D. Saunders, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and CARTER, LAVORATO, SNELL, and TERNUS, JJ.

HARRIS, Justice.

This appeal challenges a district court order terminating a parent-child relationship. The order, entered pursuant to Iowa Code section 232.116(1)(g) (1995), severed the relationship between Jenifer and David K. and their son, C.K., born November 23, 1993. There is little controversy concerning the background facts. The seriously controverted issue is whether sufficient efforts to develop both parents' parenting skills have been exhausted. We think they have been, and we therefore affirm the termination order. In so doing we vacate a court of appeals

decision that would have ordered further efforts as to the mother.

As is frequent in termination cases, the record here makes depressing and touching reading. The question is often a painful one: whether the best interests of the child demand a result that will be heartbreaking for parents who are clearly unable to fill the parenting role. Or, to put the question in its converse, can the natural temptation to treat tragic parents with exhaustive patience overcome the result demanded in order to secure a chance in life for the child?

Like the district court, we think the facts here are obvious in their demands. The child desperately needs to be rescued, and it is past time for doing so. It would be fruitless to experiment further with ways to develop David's or Jenifer's parenting skills.

■ I. General legal principles are well settled and not seriously controverted. Iowa parental termination statutes are preventative as well as remedial. *In re E.B.L.*, 501 N.W.2d 547, 549 (Iowa 1993). "[T]he General Assembly has carefully crafted a legislative framework for state intercession into the parent-child relationship while protecting wherever possible the integrity of the family unit." *In re I.L.G.R.*, 433 N.W.2d 681, 689 (Iowa 1988). The statutes are designed to prevent probable harm to a child. *In re E.B.L.*, 501 N.W.2d at 549. The paramount consideration in parental termination proceedings is the best interests of the child. Iowa R.App. P. 14(f)(15).

■ In seeking out those best interests, we look to the child's long-range as well as immediate interests. *In re L.L.*, 459 N.W.2d 489, 493 (Iowa 1990). This requires considering what the future holds for the child if returned to the parents. *Id.* at 493–94. When making this decision, we look to the parents' past performance because it may indicate ·the quality of care the parent is capable of providing in the future. *Id.* at 494.

■ The State has a duty to see that every child within its borders receives proper care and treatment. *In re J.W.D.*, 456 N.W.2d 214, 217 (Iowa 1990). This includes at a minimum proper food, clothing, discipline, and supervision because "[e]very child deserves a safe, healthy and stimulating environment in which to grow and mature." *Id.*

The juvenile court here terminated both parents' rights pursuant to Iowa Code section 232.116(1)(g), which provides that parental rights may be terminated when all of the following have occurred:

(1) The child is three years of age or younger.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code section 232.102(1) provides in material part:

1. After a dispositional hearing the court may enter an order transferring the legal custody of the child to one of the following for purposes of placement:

*a.* A relative or other suitable person.

*b.* A child placing agency or other suitable private agency, facility or institution which is licensed or otherwise authorized by law to receive and provide care for the child.

*c.* The department of human services. . . .

Under Code section 232.102(5) a court may not terminate parental rights unless there is clear and convincing evidence that:

*a.* the child cannot be protected from physical abuse without transfer of custody; or

*b.* the child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available.

Iowa Code section 232.2(6) provides in relevant part:

*"Child in need of assistance"* means an unmarried child:

. . . .

c. Who has suffered or is imminently likely to suffer harmful effects as a result of. . . .

(2) The failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.

■ Further acknowledgment of natural parents' rights appears in Iowa Code section 232.102(8) which provides that the placement of a child elsewhere shall be terminated and the child returned home if "the court finds by a preponderance of the evidence the child will not suffer harm in the manner specified in section 232.2, subsection 6." Criteria to be considered in determining whether children should be removed from the home are also applied in determining whether the children may be safely returned to the home. *In re M.W.*, 458 N.W.2d 847, 850 (Iowa 1990).

Both parents concede the first three parts of section 232.116(1)(g) have been met. The disputed issue, under section 232.116(1)(g)(4), is whether there is clear and convincing evidence C.K. cannot be returned to either Jenifer's or David's custody.

II. The following is a summary of the facts we find on our de novo review of the record. The Iowa department of human services (DHS) became involved with the family in December 1993, the month following C.K.'s birth. The matter had been referred because of the house's unsanitary condition (dog feces on the floor).

DHS promptly (in January 1994) began providing Jenifer and David desperately needed parental skill development and homemaking services. The attempt proved to be short lived. The services were withdrawn in March 1994 because Jenifer and David refused to get up by 8 a.m. when the homemaker would arrive.

On June 22, 1994, DHS investigated another referral about the unhealthy and unsafe condition of the home. As an upshot, the parents agreed that C.K. would stay with David's mother until Jenifer and David cleaned up the house. On June 29 an abuse investigator went to the home to check on the parents' progress and found C.K. had returned without DHS's consent and observed continuing deplorable conditions. On July 5 DHS founded a report of denial of critical care. Homemaker services were reinitiated, again with unsatisfactory results.

Jenifer and David were absent from the home for about fifty percent of the homemaker's fifty scheduled visits. On August 24 a petition was filed alleging C.K. was a child in need of assistance (CINA). In August and September Jenifer and David were again found to have denied C.K. critical care based upon conditions in their home. C.K. was ordered placed in foster care on September 20, 1994, pursuant to Iowa Code section 232.102.

An outpatient psychological evaluation of Jenifer and David was conducted. The report on that evaluation concluded with four recommendations: (1) C.K. not be allowed to be left alone with David; (2) appropriate parenting skills be modeled for David by a "professional child development specialist"; (3) Jenifer enroll in individual psychotherapy to "face and learn to deal with painful and emotional issues from her chaotic past"; and (4) C.K. attend a licensed day care facility in order to provide Jenifer and David some respite.

On November 10, 1994, C.K. was adjudicated a CINA, and his placement in foster care was continued. DHS was directed to provide parent skill development, supervised visitation, and information and education to the parents about maintaining a home "with specific direction given as to those items which may be dangerous to the child." The court noted a marriage breakdown and observed that the parents' separation "may be imminent." DHS was to increase supervised visitation, provide marital counseling for the couple, and individual therapy for Jenifer. When these efforts failed, the State filed a petition to terminate Jenifer's and David's parental rights on March 31, 1995. The peti-

tion remained pending until it was set for hearing for September 28, 1995.

Meanwhile a review order, filed on May 26, 1995, noted that Jenifer was planning to attend Job Corps where several services were available to her. It appeared that the marriage between David and Jenifer had failed and the two were not going to reconcile. It also appeared that Jenifer's individual counseling and marriage counseling had ceased. The court found there had not been sufficient progress by either parent to allow the child to return home. The court nevertheless ruled, "[g]iven the recent change in the mother's home placement and desire to enter the Job Corps, renewed services toward reunification with her will be required."

On October 4, 1995, after a hearing, the court terminated Jenifer's and David's parental rights pursuant to Iowa Code section 232.116(1)(g).

■ III. David contends DHS has not presented clear and convincing evidence that C.K. cannot be returned to him, or to his brother as foster parent. We are however convinced that David's challenge must fail. He is tragically limited intellectually, and functions with significant emotional and personal defects. His thought processes are often distorted. His parenting attitudes and knowledge are so deficient as to render him totally inadequate as a parent. He could easily become dangerous, and poses a threat to C.K.'s health and safety, and psychological well being. David is simply unable to care for C.K.

Parenting skills have been offered to David since February 1994, but he has made no progress. The father-son bond has already ceased. Because the house has been so unsanitary and unsafe, scheduled visits with C.K. were impossible and had to be canceled. The water and electricity were shut off, there was clutter throughout the house, and the bathroom contained buckets of feces. He was evicted for nonpayment of rent. David admitted he would need help both with raising C.K. and performing household tasks if C.K. were returned to him. He is not even requesting that return.

David does argue that C.K. should be placed in foster care with his—David's—brother, thus precluding the need to terminate David's parental rights. He cites Iowa Code section 232.102(1)(a), previously quoted, which provides that the court may transfer legal custody of the child to a relative for purposes of placement. David's brother is a licensed foster parent who is said to be willing and able to take custody.

■ An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child. The child's best interests always remain the first consideration. *In re L.M.F.*, 490 N.W.2d 66, 67 (Iowa App.1992). We have already indicated that it is in C.K.'s best interests to terminate David's parental rights. Placement with David's brother would be less advantageous to C.K. We conclude that David's parental rights were correctly terminated.

■ IV. Jenifer's challenge is stronger than David's, but we think it must also fail. Distancing herself from David's shortcomings, she argues there has not been clear and convincing evidence that C.K. cannot be returned to her custody. As with David, the issue centers on whether it has been shown by clear and convincing evidence that Jenifer would fail to "exercise a reasonable degree of care in supervising" C.K. if he were returned to her. *See* Iowa Code § 232.2(6)(c)(2).

In contending she is capable of keeping a clean and safe home, she blames David for the prior unclean, unsafe, unsanitary, and dangerous conditions. She maintains that now that she is separated from him, she has and will keep a clean and safe home. But we think Jenifer must share with David a full measure of blame for the house's deplorable conditions. Moreover her willingness to abide those conditions is itself revealing, and strong evidence of her inability to provide a decent home.

Even if Jenifer were now able to keep a clean home, at the time of trial she lived in a cabin unsuitable for C.K. She even refused to tell DHS where the cabin was located. She

was certainly not ready to have C.K.'s custody.

Jenifer also maintains that she has the potential for good parenting skills and that she should be given another chance to show that she is capable of being a responsible parent. She argues for an additional six months to prove her parenting ability, contending she is now motivated to succeed at counseling and to confront her own past abuse problems.

It is true that Jenifer's parenting attitudes and skills are superior to David's, but the record is clear that they are nevertheless wholly inadequate. For one thing, she suffers from deep seated personality disorders that render her incapable of putting into effect any skills she claims to possess. The problem is tragically confounded by the fact that her disorder causes her to spurn recommended psychotherapy when it is made available to her. A most unfortunate past has left her with a pervasive, suspicious outlook that is the most striking characteristic of her personality. Events have deprived her of any ability to trust those who try to help her.

Jenifer attempted counseling after C.K. was removed from the home. DHS offered counseling that would have been free to Jenifer. Her attendance was sporadic. When she did attend, she withheld her cooperation, stating she had no issues from her past that needed addressing.

Jenifer left for Job Corps in June 1995, where she was to be provided psychotherapy. As the juvenile court however found, "there is no indication that these sessions were productive during the brief two-month period [Jenifer] was at Job Corps." The juvenile court also found there was no significant improvement in her emotional problems. It is clear that all psychotherapy up to this point has been unsuccessful. This is a strong factor favoring termination because it is clear that Jenifer's inability to address her past problems has prevented her from being an effective parent.

It is often disputed how long parents should be allowed to demonstrate they can develop the ability to be parents. Accordingly the legislature, in Code section 232.116(1)(g)(3), has established a six-month standard. See In re A.C., 415 N.W.2d 609, 614 (Iowa 1987) ("It is unnecessary to take from the children's future any more than is demanded by statute."). The legislature adopted the standard in the belief that this period must be reasonably limited because, "beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children." Id. at 613. A child should not be forced to suffer in the limbo of parentless foster care. In re D.J.R., 454 N.W.2d 838, 845 (Iowa 1990). A child should not be forced to endlessly await the maturity of a natural parent. In re T.D.C., 336 N.W.2d 738, 744 (Iowa 1983).

Jenifer's argument that she is now motivated and will succeed at counseling and will be able to be a good parent cannot be summarily dismissed. But under our cases further patience with Jenifer must now yield to C.K.'s needs. "The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." In re A.C., 415 N.W.2d at 613. "Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." In re L.L., 459 N.W.2d at 495. It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together. In re J.L.P., 449 N.W.2d 349, 353 (Iowa 1989).

V. Both Jenifer and David argue that reasonable efforts were not made by the State to allow each to be reunited with C.K. Jenifer claims she was not provided the counseling services she needed, was not provided reasonable visitation opportunities to show she could care for C.K., and was not allowed the opportunity to show she could provide adequate parental skills now that she is separated from David. David claims he was not given the proper modeling services for mentally challenged people and that his service provider did not have the proper training or education to help him.

Jenifer says she is now motivated to succeed at psychotherapy and that she will get a job and find a place where she and C.K. can

live. We however adopt the view of the juvenile court:

Only when [Jenifer] was [faced] with the immediate reality of a termination of her parental rights did she take any steps to separate from David and seek job skills for herself. The harsh reality of the situation is, however, that she did not take these steps twelve months ago when the child was removed from her custody. There exists no guarantee and moreover no reasonable likelihood that an additional period of time allowed ... would result in any change in her participation and success in services needed for her to appropriately parent her child.

We have carefully reviewed the record and find no factual support for the claims. To the contrary, DHS's painstaking efforts, thwarted and rejected by both David and Jenifer, easily qualify as reasonable.

We commend Jenifer's counsel for outstanding advocacy both in juvenile court and on appeal. To his considerable credit he has left no stone unturned in presenting her cause.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**