# IN THE COURT OF APPEALS OF IOWA

No. 17-0054
Filed March 22, 2017

**IN THE INTEREST OF N.M.,**
**Minor child,**

**M.K., Mother,**
　　　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.

The mother appeals from the juvenile court order terminating her parental rights to her minor child. **AFFIRMED.**

Jeffrey A. Wright of Carr & Wright, P.L.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant Attorney General, for appellee State.

John P. Jellinek of Juvenile Public Defender's Office, Des Moines, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The mother appeals from the juvenile court order terminating her parental right to her child, N.M., born in April 2014.[1] The mother maintains the statutory grounds for termination have not been met because N.M. could be returned to her care at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4) (2016). Additionally, she maintains termination is not in N.M.'s best interests and a permissive factor weighs against terminating her rights. *See* Iowa Code § 232.116(2), (3).

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) became involved with the family in November 2015 due to allegations the mother was using methamphetamine while caring for N.M. When confronted, the mother admitted to the drug use; N.M. was removed and placed in the maternal grandmother's care on November 10, 2015.

Even before the official removal, N.M. had been staying with his maternal grandmother during the week and spending time with the mother and her paramour on weekends. The informal arrangement began due to issues the mother was having with her mental health. The mother reported to DHS that she had been previously diagnosed with borderline personality disorder, bipolar disorder, anxiety, and depression. Additionally, she was suffering from

---

[1] At the time of the termination hearing, the biological father of N.M. had yet to be confirmed. Some possible fathers, according to statements made by the mother, had been ruled out by DNA testing, and another named man had not completed paternity testing and his whereabouts were unknown. The juvenile court terminated the parental rights of the man who had failed to complete testing "and any unknown and putative fathers" pursuant to section 232.116(1)(b). No father has appealed.

postpartum depression and was struggling to bond with N.M. She was already seeing a therapist weekly, and she had been prescribed medication by a psychiatrist. The mother had been hospitalized due to mental-health issues as recently as May 2015; she has a long history of struggling with mental illness and was first hospitalized for mental-health issues when she was in third grade.

Throughout the duration of the proceedings, the mother remained motivated to have N.M. returned to her care. She attended most of her therapy sessions and, according to her therapist, had made positive strides. The therapist recommended she continue to attend therapy sessions regularly for the foreseeable future.

However, the mother was less successful in other areas. She admitted that she had relapsed on methamphetamine in October 2015—the act that began DHS involvement—and again in August 2016. Additionally, the mother had a number of drug patches that were positive for drug use and others that had been tampered with.[2] After her August 2016 relapse, the mother completed a new substance-abuse evaluation and was diagnosed with "severe amphetamine-type substance stimulant use disorder." It was recommended that she begin an extended outpatient drug treatment program. Although the mother began the program, she attended only one individual session and one group session before being unsuccessfully discharged for lack of attendance on October 25, 2016.

In October 2016, the mother allowed her boyfriend, a registered sex offender, to move into her apartment. She did this in spite of DHS's warnings

---

[2] We note the mother denied any other drug use except the two admitted relapses and she denied intentionally tampering with the patches.

that N.M. could not be returned to her if she allowed a sex offender to live with her. The mother moved the boyfriend in but denied that she was living with anyone when she was asked. DHS only learned the boyfriend was living with the mother—approximately one month later—when the boyfriend updated his residence on the sex offender registry to that of the mother's apartment. Once she was confronted, the mother reported that the boyfriend would be moving back into the hotel where he previously lived.

Supervised visits took place at the mother's apartment before the boyfriend moved in. The mother was generally good at having food and toys for N.M. However, the mother struggled to ensure the apartment was clean and safe for N.M.; at several visits, the family safety, risk, and permanency (FSRP) worker indicated that N.M. was seen holding or putting in his mouth coins, cigarette butts, medications, or food that been spilled on the floor. The FSRP worker reminded the mother repeatedly that she needed to buy outlet covers and other child safety devices to make the apartment safe for N.M., but the mother was more focused on getting a bed and dresser and things N.M. would need if he was returned to her care.

The mother also struggled with budgeting. She received $733 each month in Social Security Disability as well as housing assistance, food assistance, and Title XIX insurance. At times, the mother reported to the FSRP worker that she did not have food in the home for herself but later stated that she ordered cable and internet for $90 per month so N.M. would have a selection of "kids channels" during visits at the apartment. A number of visits took place at a

local McDonald's, and the mother often had to call someone to come buy N.M.'s meal for her.

The mother has a history of criminally violent behavior, including two criminal prosecutions for simple assault, one for assault causing bodily injury, one for domestic abuse assault causing injury, and another for assault on a peace officer. The mother was charged with felony assault with intent to inflict serious injury on January 31, 2016. At the time of the termination hearing, she was on probation after pleading guilty to the charge. Additionally, at the termination hearing, it became clear the mother was "likely going to jail" following the hearing. The State found the mother had outstanding warrants for her arrest in Johnson and Linn Counties for domestic abuse assault and assault causing bodily injury. According to the State, the mother's probation officer "decided that she would not arrest mom immediately but would give her the opportunity to attend her termination of parental rights hearing." If there was a likely disposition of the outstanding warrants, it is not in the record before us.

Following the termination hearing, on December 27, 2016, the juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(h).

The mother appeals.

## II. Standard of Review.

We review termination proceedings de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). While we are not bound by the findings of the juvenile court, we give them weight, especially in assessing the credibility of witnesses. *Id.*

**III. Discussion.**

We first consider whether the statutory grounds for termination have been met. *See id.* ("The first step is to determine whether any ground for termination under section 232.116(1) has been established."). Here, the mother challenges only the juvenile court's finding that N.M. could not be returned to her care. *See* Iowa Code § 232.116(1)(h)(4).

While the mother had made strides in recognizing and learning to cope with her mental health issues, it was not clear the mother could keep N.M. safe. She had relapsed on methamphetamine less than three months before the termination hearing. The mother maintained it was a one-time occurrence and that she was back on track to remain sober, but we note that she had since been diagnosed with a severe substance-abuse disorder and had failed to complete the recommended treatment. According to the mother's testimony, she has been learning a number of coping strategies that she uses instead of relying on illegal drugs. While we support her progress, we question whether these coping skills, which appear to involve isolating herself from others,[3] are compatible with being a full-time single parent of a two-year-old.

While the mother was appropriate and loving towards N.M. during visits, she repeatedly had to be reminded that he could and would pick things up from the floor and put them in his mouth. The mother's decision to allow her boyfriend, who is a registered sex offender, to move in despite knowing the risk it posed leads us to question her protective abilities. We agree with the district

---

[3] The mother testified she watches movies to cope. Additionally, she talked about "needing breaks" and explained that she would shut herself in the bathroom "with the door cracked open" if she needed a break while N.M. was in her care.

court that there is clear and convincing evidence N.M. could not be returned to the mother's care.

Next, we consider whether termination of the mother's rights was in N.M.'s best interests. *See* Iowa Code § 232.116(2). The mother maintains it is not because of the strong bond she and N.M. share. At the time of the termination hearing in November 2016, N.M. was two-and-one-half years old. He had been formally removed from his mother's care for one year, but N.M.'s maternal grandmother had been his primary caregiver even before DHS's intervention. When asked, the mother agreed the maternal grandmother had cared for N.M. for large parts of his life, the grandmother "was probably his primary attachment," and he had spent "larger parts of time" with the grandmother than he had with the mother. And while the mother has made progress since she began voluntarily leaving N.M. with the grandmother, the mother's therapist indicated the mother "has a long way to go before she is completely stable due to her ongoing mental health issues." The mother and N.M. share a bond, but we cannot say it is so strong that termination is not in N.M.'s best interests.

Finally, the mother maintains the juvenile court should not have terminated her parental rights because her mother had legal custody of N.M. *See* Iowa Code § 232.116(3)(a). She claims the court "should have declined to terminate as the matter could have been resolved in a less severe fashion with a guardianship order." First, we note that guardianships are not legally preferred to the termination of the parent's rights. *See In re L.M.F.*, 490 N.W.2d 66, 67–68 (Iowa Ct. App. 1992) (stating that placement of children pursuant to permanency orders is not a legally preferential alternative to terminating parental rights when

there is sufficient evidence to terminate). In fact, "[a]n appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child." *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997). Additionally, there is nothing in the record that suggests the maternal grandmother was willing to enter into a guardianship of N.M. Here, the permissive factor does not weigh against terminating the mother's parental rights. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (stating the factors in section 232.116(3) "are permissive, not mandatory," and the court may use them at its discretion "based on the unique circumstances of each case and the best interest of the child").

We affirm the juvenile court order terminating the mother's parental rights.

**AFFIRMED.**