**IN THE COURT OF APPEALS OF IOWA**

No. 22-1875
Filed April 12, 2023

**IN THE INTEREST OF G.C. and L.C.,**
**Minor Children,**

**K.C., Mother,**
    Appellant,

**JAMI J. HAGEMEIER,**
    Guardian Ad Litem-Appellant.

**STATE OF IOWA,**
    Appellant.
_____

    Appeal from the Iowa District Court for Polk County, Rachael E. Seymour,

District Associate Judge.


    A mother appeals the termination of her parental rights. The State and the

guardian ad litem appeal the denial of the termination of the father's parental rights.

**AFFIRMED ON THE MOTHER'S APPEAL; REVERSED AND REMANDED ON**

**THE GUARDIAN AD LITEM'S APPEAL AND STATE'S APPEAL.**



    David V. Newkirk of Branstad & Olson Law Office, Des Moines, for appellant

mother.

    Jami J. Hagemeier of the Youth Law Center, Des Moines, appellant and

guardian ad litem.

Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellant State.


Considered by Schumacher, P.J., Ahlers and Buller, JJ.

**SCHUMACHER, Judge.**

We address three separate appeals in this opinion. A mother appeals the termination of her parental rights to a set of two-year-old twins, G.C. and L.C. Both the State and guardian ad litem (GAL) appeal the court's order that denied termination of the father's parental rights to the twins.

We conclude clear and convincing evidence supports the termination of the mother's parental rights under Iowa Code section 232.116(1)(g) (2022). We also conclude termination of the mother's parental rights is in the children's best interest. And, like the juvenile court, we determine that no statutory exceptions should be applied to preclude termination of the mother's parental rights. Accordingly, we affirm the juvenile court as to the termination of the mother's parental rights.

As to the State and GAL appeals, we determine the State established a ground for termination of the father's parental rights, termination of the father's parental rights is in the children's best interest, and no statutory exception should be applied to preclude termination of the father's parental rights. We reverse the decision of the juvenile court that declined to grant termination of the father's parental rights and remand for entry of an order terminating the father's parental rights pursuant to Iowa Code section 232.116(1)(g).

**I.      Background Facts & Proceedings**

The cause of injury to G.C. in March 2022 was trauma. As described by Dr. Nielsen, a member of the University of Iowa's multi-disciplinary team, G.C. had bilateral subdural hemorrhages—bleeding inside her skull but outside of her brain— on both sides of her head. The radiology report revealed the hemorrhages

were subacute to chronic in nature, meaning the injury did not occur immediately prior to G.C.'s March hospitalization.[1] G.C.'s injuries were suspected to be nonaccidental trauma, as her caretaker, the father, could provide no plausible accidental cause for the extent of the injuries. Physical abuse was listed as the highest concern.

Dr. Nielsen described G.C.'s trauma as a type of force that causes injury, and for subdural hemorrhages, it is generally a large trauma, such as a motor vehicle accident, falls from significant height of greater than four feet, a forceful attack, or abusive head trauma. G.C. also presented at visits with the mother in January and February 2022 with numerous bruises and scratches on her face and other limbs, which the mother photographed. Dr. Nielson, in reviewing the images of the bruises and scratches, however, could not say with certainty that they were not from child play.[2] But Dr. Nielsen did opine with a reasonable degree of medical certainty that G.C.'s head injury was not from being knocked over by a family pet, a normal toddler fall, or from banging her head against things, all explanations offered by her father. Dr. Nielsen also noted that following a hematology consult,

---

[1] G.C. required medical care in January 2022 after the father's wife reported she found G.C. unresponsive. Dr. Nielsen testified that G.C.'s January medical event was not outside the realm of possibility for the date of the incident causing the subacute hematoma.

[2] G.C. was also discovered to have a torn upper labial frenulum, the tissue that connects the upper lip to the gums. This injury was not able to be determined to be inflicted and it could not be ruled out that the torn upper labial frenulum was caused by G.C. having a normal toddler fall and hitting her mouth. Dr. Nielsen noted G.C.'s teeth were in poor condition.

the hematology team did not feel that there was any underlying bleeding disorders that contributed to G.C.'s subdural hemorrhage.[3]

To put G.C.'s injuries and the termination proceedings in the context of Iowa Code section 232.116(1)(g), one of the grounds the juvenile court relied on for the termination of the mother's parental rights, and also the ground raised on appeal by both the State and the GAL concerning the father's parental rights, a timeline of parental involvement with the court and Iowa Health and Human Services (HHS) is essential.[4]

The mother has given birth to seven children, none of which are in her custody. Her parental rights were terminated to four of the five children not involved in the current appeal, with the fifth child being placed in the sole custody of that child's other parent. The father is the biological parent of four of the seven children: M.M., B.C., and the twins involved in the instant proceedings. Like the mother, none of the father's children are in his custody. His parental rights were previously terminated to M.M. and B.C.

The parents' involvement with the Iowa HHS began in 2015 because of domestic abuse the father perpetrated against the mother in front of two children. *In re M.M.*, No. 17-0237, 2017 WL 2461889, at *2 (Iowa Ct. App. June 7, 2017).

---

[3] The juvenile court order noted an "abnormality in G.C.'s hematology labs which requires a follow up lab work in a year with a hematologist to rule out any bleeding disorders." But Dr. Nielsen and the hematology team determined no underlying bleeding disorders would have caused G.C.'s intercranial hemorrhage. And while the father called a registered nurse to testify as an expert to G.C.'s injuries, this witness had never examined the child. The father's expert's opinion was that the injuries to G.C. were caused by trauma, nonaccidental or accidental, or a medical condition. A specific medical condition was not identified in the record.

[4] The State's petition pled a single statutory ground with respect to the father–section 232.116(1)(g).

Concerns in that case centered primarily on the parents' unhealthy and domestically violent relationship, including a pattern of dishonesty by both parents as it related to disclosing their relationship to providers and the court. *Id.* The father also used methamphetamine. The juvenile court terminated the parental rights of both parents under Iowa Code section 232.116(1)(h) (2016). Termination of the father's parental rights was affirmed on appeal. *Id.* However, on appeal, this court reversed the juvenile court's order terminating the mother's parental rights, focusing on the mother's progress in separating from the father by moving to Missouri. *Id.* at *3.

The mother's progress was short-lived. It was discovered that the mother had been dishonest about her relationship with the father. *In re M.M.*, No. 19-0598, 2019 WL 3317403, at *2 (Iowa Ct. App. July 24, 2020). She minimized the father's domestic abuse and failed to prioritize her relationship with her child, frequently missing visits. *Id.* The juvenile court terminated her parental rights to M.M pursuant to Iowa Code section 232.116(1)(h) (2018). That decision was upheld on appeal. *Id.* at *3.

The parents were involved in proceedings again for two more children, A.M. and J.C.[5] *See In re A.M.*, No. 19-1735, 2020 WL 825975, at *1 (Iowa Ct. App. Feb. 19, 2020). A.M. tested positive for methamphetamine. *Id.* at *2. The mother struggled to maintain stable housing and continued her unhealthy relationship with the father. She made light of the dangers the father posed to her and the children.

---

[5] The mother is the biological parent of both A.M. and J.C. The father was determined through paternity testing not to be the biological parent of either child, although he acted as a legal parent to A.M. The rights of any putative fathers of the children were terminated.

*Id.* at *3. The father, for his part, was often aggressive with providers, including while on the witness stand. The mother's parental rights to both children were terminated under Iowa Code section 232.116(1)(g) and (h) (2019), which was affirmed by this court.[6] *Id.* at *2-3.

The State moved to terminate the parents' rights to another child, B.M., in late 2019. *See In re B.M.*, No. 20-0609, 2020 WL 4207406, at *2 (Iowa Ct. App. July 22, 2020). Reasonable efforts were waived in that case because the parents had failed to make sufficient progress since 2015 despite services focused on mental health, domestic violence, and substance abuse. *Id.* Once again, the parents were dishonest about the nature and extent of their relationship.

The juvenile court noted in the termination order that "both parents are either unable or unwilling to take the necessary steps to provide a safe and stable home for the child free from domestic violence or substance abuse issues and neither additional time or services would correct the situation." *Id.* Stable housing remained an issue. *Id.* And the father had to be hospitalized for excessive drinking in 2019. *Id.* at *4. In the order of termination, the juvenile court noted, "The Court has seldom seen individuals have so few qualms about repeatedly lying under oath. The only thing the Court can trust about the parents' statements is that they will say whatever they believe will best serve their immediate needs or position." The juvenile court terminated the parents' rights under section 232.116(1)(g), which was affirmed on appeal. *Id.* at *3-4.

---

[6] This court affirmed as to section (h) but did not consider (g). *See A.M.*, 2020 WL 825975, at *3.

G.C. and L.C., the children at issue in the instant appeal, were born prematurely in June 2020. The children were removed from parental custody in July upon release from the neonatal intensive care unit and placed in the custody of a relative who had adopted A.M. and J.C. HHS was primarily concerned about the parents' unresolved domestic abuse issues, including the father's anger and controlling behavior and the mother's lack of insight into his abuse; their lack of protective capacity; and the father's substance abuse. There were also ongoing issues with contact between the parents. The children were adjudicated in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2020). Paternity testing established the father was a biological parent of the twins in September.

The father married J.M. in June 2020, who had four children from a prior relationship.[7] J.M.'s children in the home were ages six, three, three, and two. J.M.'s children were safety planned out of the home for a period following G.C.'s hospitalization in March 2022 but were later reunited with their mother.

Following paternity confirmation, the father participated in Safe Care, a child-parent psychological assessment, individual therapy, marriage counseling, and maintained a job and housing. He and his therapist focused on his anger, including coping with triggers. They have also focused on overcoming the "trauma bond" he shares with the mother. The father obtained a new individual therapist upon HHS's request in May 2022.

---

[7] The juvenile court's order noted that the father's wife had previously testified she knew the father for six months before their marriage. The father later testified he has known his new wife for twelve years.

Despite the work on the toxic relationship with the mother, the father had ongoing contact with the mother from the fall of 2021 through February 2022. The substance of the communications—which included phone calls and text messages—were frequently inappropriate, including the father asking the mother for sexually explicit photos and exhibiting controlling behavior, such as inquiring about her whereabouts and what vehicle she was driving. The messages also indicate the mother hung-up on the father repeatedly, which angered him. The communications only came to the attention of HHS after the mother disclosed the taped conversations in March 2022. The father, while not denying the inappropriate nature of the messages, contends the messages and phone calls were focused on co-parenting.

Following a permanency hearing, the court granted the father an additional six-months for reunification efforts. The twins were placed in the father's custody in September 2021, about fifteen months after the initial removal. The stay in the father's custody was brief. In January, G.C. required hospitalization after the father's wife reported G.C. had a seizure. G.C. was taken to the hospital, where staff recommended she see a neurologist. After G.C's release from the hospital to her father, the father failed to schedule this neurological appointment. Then, in early March, G.C. was rushed to the hospital after the father's wife reported she had found G.C. unresponsive. The father had not yet scheduled the neurology appointment recommended two months earlier.

G.C. was transported to the University of Iowa Hospitals where testing concluded G.C. had suffered trauma to the head, which a medical expert ascribed to either a car crash, a fall from over four feet high, or abuse. The father suggests

G.C.'s injuries resulted from the child being clumsy, being knocked over by one of the family pets, or that G.C. caused the injury herself by self-soothing, in banging her head against a wall. G.C. underwent surgery and a shunt was placed in her head, allowing fluid to drain from her head into her stomach. Due to the unexplained injury and the discovery of ongoing communication between the parents, the children were removed from the father's custody and placed back in the custody of the relative where they remained at the time of the termination hearing.

Throughout G.C. and L.C.'s underlying CINA case, the mother's involvement has been inconsistent. She did not have any contact with the children from July 2021 until January 2022. Since March, she had two fully supervised visits a month. She attended individual therapy designed to address her history of enduring domestic violence but allowed contact with the father.

The juvenile court noted in the ruling filed June 2022 following a contested permanency review hearing that placement outside the home remained necessary, in part due to "the parents lack of protective capacity and numerous unexplained injuries to G.C. resulting in hospitalization and brain surgery."

The State petitioned to terminate the parents' parental rights in April 2022.[8] A hearing that lasted eight days began July 5 and ended August 25.[9] On the first

---

[8] While hearing on the termination petition was set for begin in June 2022, it was continued to allow the permanency review and modification hearing to be concluded.

[9] Our appellate record also contains the transcript from the contested permanency review hearing which was held on April 6, May 13, May 31, and June 21, 2022. Portions of this hearing were judicially noticed into the termination proceedings, specifically the testimony of Dr. Nielsen and Katherine Thornton. Our appellate record does not contain the transcript from the permanency hearing.

day of trial, the mother orally consented to the termination of her parental rights, asserting it was in the children's best interests. The mother did not attend the next six days of the hearing. She re-appeared on the final day of the hearing, August 25, and orally revoked her consent. She later filed a motion titled, "Revocation and Rescission of Consent to Terminate Parental Rights" on September 8, along with a request for a six-month extension.

The HHS case manager testified that the father continued to do only the minimal amount. And the father only disclosed minimal information, which he had done historically in past cases. She stressed that since the father was dishonest with his own treatment providers, he was not making progress. "When you're continuing to lie and hide, you're just not able to address your needs, and so you can go to therapy or treatment and sit there, but you're not really engaging meaningfully in that service." And the case manager, who had been involved with the parents since the filing of the underlying CINA petition, added:

> I think Dad has been trying to stress that in the last three weeks he has started to make significant progress in his therapy services, but I think that that's been a pattern for him. I think that he will consistently try to portray that he's making progress in his therapy services and then—and then something will come out, and then we'll start over in a sense or we'll backpedal, and these children should not have to wait any longer. It's been almost two years of the back and forth, and they deserve permanency.

The district court terminated the mother's parental rights on October 31, 2022, pursuant to Iowa Code section 232.116(1)(a) and (g) (2022). But the court declined to grant the State's requested termination of the father's parental rights.

The children remained placed out of parental custody.[10]  The mother, the State, and GAL appeal.[11]

## II.      Standard of Review

Our review of the termination of parental rights is de novo.  *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).  We examine both the facts and law, and we adjudicate anew those issues properly preserved and presented.  *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App.1995).  We give weight to the findings of the juvenile court, especially concerning the credibility of witnesses, but we are not bound by them.  *See id.* at 480–81.

> While giving weight to the findings of the juvenile court, our statutory obligation to review termination proceedings de novo means our review is not a rubber stamp of what has come before.  We will thus uphold an order terminating parental rights only if there is clear and convincing evidence supporting termination of the parent's rights.  Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence.

*In re D.H.*, No. 14-1965, 2015 WL 1055517, at *1 (Iowa Ct. App. Mar. 11, 2015) (internal citations omitted).

We review the termination of parental rights in a three-step analysis.  *P.L.*, 778 N.W.2d 39.  We first examine "if a ground for termination exists under section 232.116(1)."  *Id.*  We then determine if termination is in the best interests of the child.  *Id.*; *see also* Iowa Code § 232.116(2).  Finally, we may decline to terminate parental rights if any exception found in section 232.116(3) applies.  *Id.*

---

[10] Although the order entered following the termination hearing originally placed custody of the twins with HHS for pre-adoptive placement, a nunc pro tunc order later confirmed custody remained with a relative.

[11] The State filed a responsive brief to the mother's appeal; the father did not file a responsive brief to the State and GAL's appeals.

### III.    Mother

The mother appeals the termination of her parental rights.  She claims the State failed to establish a ground for termination, termination is not in the children's best interests, and that her close bond with the children should prevent termination.

### A.    Ground for Termination

The district court terminated the mother's rights under section 232.116(1)(a) and (g).  "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record."  *In re A.B.*, 815 N.W.2d 764, 775 (Iowa 2012).  We choose to focus on section 232.116(1)(g).  That section is met when the court finds all of the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family or a court of competent jurisdiction in another state has entered an order involuntarily terminating parental rights with respect to another child who is a member of the same family.
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

We agree with the juvenile court that the State provided clear and convincing evidence to support termination of the mother's parental rights under Iowa Code section 232.116(1)(g).  The mother has been absent for a bulk of the proceedings, electing not to see her children for seven months.  Her participation in services has been minimal.  She has not consistently addressed her mental health needs.  She has failed to demonstrate a stable living arrangement.  We determine an additional

period of time, given the mother's previous seven years of involvement with HHS and her performance in the current case, will not correct the situation.[12]

## B.    Best Interests of the Children

The mother claims termination is not in the children's best interests. When considering the children's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

We find termination is in the children's best interests. First, the mother conceded at the termination hearing that termination was in the children's best interests. She did not see the children at all from July 2021 until January 2022, at which point she only saw the children twice a month. She has not progressed beyond supervised visits. The children have never lived with the mother.

While the mother appears to have made some progress addressing her unhealthy relationship with the father, such progress tracks a long history—beginning in 2015—of making apparent progress only to regress shortly afterward. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)). "This is unquestionably one of those unfortunate cases in which a parent progresses and

---

[12] Because we find the State proved the statutory ground under Iowa Code section 232.116(1)(g), we do not address the statutory ground relied on concerning the mother's consent under Iowa Code section 232.116(1)(a).

regresses, the progress is not enough to have the child returned to their care, and matters simply reach a point at which the child's best interests command permanency and stability." *In re I.S.*, No. 20-0976, 2020 WL 6481088, at *4 (Iowa Ct. App. Nov. 4, 2020). The children need permanency. Termination of the mother's parental rights is in their best interests.

### C.    Statutory Exception to Termination

While we question whether the mother preserved this issue, we elect to reach the merits of the mother's claim. The mother asserts her close bond with the children should prevent termination. *See* Iowa Code § 232.116(3)(c). But the mother bears the burden of establishing the applicability of any statutory exceptions to termination. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). In her petition on appeal, the mother does not highlight any facts suggesting a close bond with the children, nor does she indicate how termination would be detrimental to the children. Upon our review, it is evident the bond between the mother and children is minimal. The mother elected not to participate in visits between July 2021 and January 2022. We decline to apply the exception to preclude termination of the mother's parental rights.

## IV.    Father

The State and GAL appeal the juvenile court's decision declining to terminate the father's parental rights. The State sought to terminate the father's parental rights under section 232.116(1)(g). The juvenile court determined the State had not established the last two elements by clear and convincing evidence. The State and GAL assert the father continues to act dishonestly in regards to his relationship and communications with the mother, has failed to meaningfully

address his anger and controlling behavior in therapy, failed to provide adequate medical care to G.C., and has either failed to supervise or is actively abusing G.C.

We begin our analysis of the claims concerning the father by highlighting a recent decision from our supreme court. When interpreting section 232.116(1)(g), our supreme court has explained:

> It is also the only ground that examines whether a "parent continues to lack the ability or willingness to respond to services," only applying to those parents who continue to repeat their parenting wrongs in spite of the services they've received in both the past and present termination cases. [Iowa Code] § 232.116(1)(g)(3). Thus, unlike other grounds for termination, which focus more on the parents' behavior in the case at issue, the juvenile court must specifically examine the parents' past termination cases in deciding whether termination is appropriate under Iowa Code section 232.116(1)(g). The State still retains the burden of proof under section 232.116(1)(g), but the parents' history of past terminations—especially when those terminations were under similar circumstances—is highly relevant in proving the parents lack the ability or willingness to respond to services.

*In re J.H.*, 952 N.W.2d 157, 166-67 (Iowa 2020).

The first two elements of the statute are met—G.C. and L.C. were adjudicated CINA and the father's parental rights have been terminated to two of the children's siblings. *See M.M.*, 2017 WL 2461889, at *2; *B.M.*, 2020 WL 4207406, at *4. The concerns in those cases were primarily the father's anger and domestic abuse, his ongoing contact with the children's mother, dishonesty with providers, and substance abuse.

In concluding that the State failed to meet it's burden with respect to the father, the juvenile court summarized the father's compliance yet issued a warning:

> However, Father has literally complied with every request [HHS] has made of him, even after removal of these children, over his continued denial of abuse. He has switched therapists, he has attended the children's doctor appointments, he drives almost an hour for his

visitation, he has abided by [HHS] visitation limitations, he continues to attend individual therapy, he continues to attend couples therapy, he has provided negative drug screens upon request, he has completed parenting assessments and successfully discharged child-parent therapy. He does continue to struggle with his toxic relationship with Mother. However, testimony from Ms. Skogland-Williams indicates they have not yet started addressing domestic violence curriculum but have begun work on boundaries and how Mother and Father's boundaries have historically been unclear due to the toxic nature of their relationship. As pointed out by Father's counsel, Father has responded to services in the past to address safety issues, such as his substance abuse. Under this evidence, the Court cannot find by clear and convincing evidence Father is unwilling or unable to respond to services which could correct the situation or that additional time would not correct the situation. If going forward, Father fails to correct his failure to provide necessary medical care, there are new incidents of domestic violence, is engaged in relationship with unsafe persons, or confirmed reports of physical abuse, the Court may make a different finding.

On our de novo review, we disagree. We determine the State established by clear and convincing evidence that the father lacked the ability or willingness to respond to services or that additional time would rectify the situation. The father has been involved in services through the department since 2015, a period of nearly seven years. A lack of protective capacity is not a new deficiency assigned to the father. As noted by the juvenile court, the father has been more consistent in services in the present case than in the past. But merely going through the motions does not equate to being able to safely parent within an additional period of time. *See J.H.*, 952 N.W.2d at 168 ("Although Dad crossed participating in therapy off of his list of services, we cannot say he made changes from it based on the pattern of dishonesty he demonstrated with his therapist.").

The father's individual therapist acknowledged that the father continues to face issues involving coping with his anger and overcoming a "trauma bond" he shares with the mother. The father engaged in inappropriate communication with

the mother between fall of 2021 and February 2022. He only admitted this after the mother produced recorded phone calls. And he did not provide this information to his therapist until after the mother produced the evidence. The juvenile court noted the father's hostility at the permanency hearing and the parents' continued "toxic" relationship. Along with the previous years of extensive services, the father has already been granted an extension of time for reunification of efforts following the permanency hearing. And after that extension of time, the children were removed for a second time due to the life-threatening injuries to G.C. At the time of the current termination hearing, he denied he had any current issues with domestic violence or that he was in need of domestic violence services. And he blamed his prior terminations on the mother, indicating that "hooking up" with the mother was the reason he "lost so many kids."

Most concerning is the father's unwillingness or inability to address the trauma G.C. experienced in his home. He failed to schedule important medical appointments for G.C., such as obtaining a neurologist. His explanation—there was a busy signal when his wife called for an appointment and the father and his wife were busy with other matters.

The father denies abuse of G.C. by himself or his new wife. He offers no plausible accidental event that could have caused the trauma to G.C. The record is clear that G.C. was placed with the father when the injuries occurred and the father failed to provide appropriate medical care. *See, e.g.*, *In re S.H.*, No. 03-0059, 2003 WL 1056591, at *2-3 (Iowa Ct. App. Mar. 12, 2003) (affirming termination of parental rights when mother in charge of the child who sustained life-threatening injuries could not give a valid explanation as to how the injuries

occurred and did not seek treatment for them). And as noted, the children have been removed on two separate occasions during the underlying CINA proceeding, extending for two years. They are young, unable to self-protect, and the time has long past for permanency given their ages. G.C. and L.C. have been out of parental custody for all but approximately five months of their lives.

"Children simply cannot wait for responsible parenting." *A.S.*, 906 N.W.2dat 474 (quoting *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997)). "While we recognize the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (per curiam) (quoting *C.B.*, 611 N.W.2d at 494). The legislature carefully constructed this time frame to balance the parent's efforts toward reunification and the child's best interests. *Id.* at 524. For the twins' age, that time frame is six months, and then "termination proceedings must be viewed with a sense of urgency." *Id.* at 523-24 (quoting *C.B.*, 611 N.W.2d at 495).

While the father has gone through many years of extensive services, there is clear and convincing evidence that the father continues to lack the ability or willingness to respond to services which would correct the situation and there is clear and convincing evidence that an additional period of rehabilitation would not correct the situation. Despite years of court intervention and HHS reasonable

efforts, the children are not safe with the father and on this record, we determine that an additional period of rehabilitation will not correct this situation.[13]

**AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON GUARDIAN AD LITEM'S APPEAL AND STATE'S APPEAL.**

---

[13] For the same reasons, on our de novo review, we determine termination of the father's parental rights is in the children's best interests. And on our careful review of this record, we decline to apply any exception found in section 232.116(3) to preclude termination.