# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0403
Filed April 29, 2026

———————————

**In the Interest of N.W., Minor Child,**

**D.W., Father,**
Appellant,

**E.P., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Appanoose County,
The Honorable Richelle Mahaffey, Judge.

———————————

**AFFIRMED ON BOTH APPEALS**

———————————

Jonathan Willier, Centerville, attorney for appellant father.

Julie De Vries of De Vries Law Office, PLC, Centerville, attorney for
appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Debra A. George, Centerville, attorney and guardian ad litem for minor
child.

———————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Schumacher, P.J.

**SCHUMACHER, Presiding Judge.**

Parents separately appeal the termination of their parental rights to their daughter, N.W., born in 2020. The mother claims the district court erred in concluding the child could not safely be returned to her custody, termination is not in the child's best interests, and termination infringes on her right to family unity. The father claims termination is not in the child's best interests and asks for additional time to work toward reunification. We review appeals of termination-of-parental-rights proceedings under our familiar three-step analysis.[1] *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3) (2025).

## MOTHER'S APPEAL

### I. Grounds for Termination

The court found grounds authorizing termination of the mother's parental rights under Iowa Code section 232.116(1)(f). On appeal, the mother claims the "[e]vidence does not support the court's finding that the child cannot be returned to the custody of the mother." *See* Iowa Code § 232.116(1)(f)(4) (requiring the State to show by clear and convincing evidence that the child could not be returned safely to the custody of either parent at the time of the termination hearing).

The Iowa Department of Health and Human Services (the department) became involved with this family in November 2023, upon reports of abuse of the child by the mother, including duct-taping N.W.'s mouth and nose shut and physical discipline that resulted in bruises to the child. There were also concerns of substance use and violence in the family

---

[1] But if a parent does not challenge a step on appeal, then we do not address it. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

home. The father was in jail, and as a condition of his status as a sexual offender, he was unable to have contact with children under the age of eighteen. N.W. was removed from parental custody, placed with a maternal aunt, and adjudicated in need of assistance (CINA).

In February 2024, the mother was arrested in Missouri on two counts of child endangerment related to her abuse of N.W.[2] The mother was released from jail after two weeks, and a no-contact order (NCO) was entered between the mother and the child. In March, the department changed N.W.'s placement to a foster family after discovering mental-health and safety concerns with the relative placement. The court entered a review order in June, noting in part:

> The NCO was dropped between [the mother and the child] at the end of March 2024. Visits began between [them] on April 9, 2024. [The mother] has been making minimal progress. She has not been actively engaged in mental health treatment. She has only attended eleven out of the eighteen visits offered. [The mother] is in a relationship with an individual who has recently been physically assaultive. She has been warned by [the department] that if she continues to be in a relationship with an individual who is unsafe, then [the child] cannot be returned to her care. [The father] has not followed through with the necessary steps to have visits with [the child], so visitation has not begun.

The mother gave birth to another child during this proceeding, who is the subject of a separate CINA case. In October, the court noted the mother continued to be minimally involved with services and she "is not consistently participating in visitation with [N.W]."

By January 2025, the case reached a turning point during which it was discussed whether the parents would be allowed additional time to work

---

[2] The mother pled guilty to the charges. But she testified she "took the blame, but it was not on me."

toward reunification or whether the department would file for termination of parental rights. The mother's visits with N.W. were fully supervised, and the mother's baby also attended. The department agreed the mother could start some semi-supervised visits if she met all the current case plan requirements, which she had not yet done.

The guardian ad litem (GAL) filed an insightful and detailed report, agreeing to additional time for the mother "with a caveat"—that "if [the mother] stops doing therapy or other court-ordered services, . . . the Department [would] file for termination immediately." The GAL explained that the mother's stagnant progress caused N.W. to bond more deeply with the foster family and made transition "more difficult for her." The GAL further noted, "My main reason for consenting to a brief continuance for Mother to have more time to reunify is the best interests of the child, who, given her personality, does not appear that she would be traumatized by a brief delay." The court thereafter entered a permanency order noting in part:

> The parties concur with [the] recommendation to provide additional time for reunification to occur. [The department caseworker] notes in his report [the mother] is at a point when she will begin semi-supervised interactions with [the child]. [The caseworker] also notes that based on the progress [the mother] has demonstrated over the past few months it is likely [the child] could be returned to [the mother]'s care if she continues down the current path.

But the mother made little progress during the six-month period. At the end of that time, she had just met the requirements to begin semi-supervised visits with N.W. During one of those visits, the mother allowed the maternal grandmother and other relatives to be around the child, despite those individuals not being allowed at the visit due to the family's long history of sexual and physical abuse. The mother also reported she has been "losing

her shit" everyday due to "family drama." N.W. exhibited signs of stress after the visit, including urinary incontinence. The GAL reported that the mother:

> [C]ontinues to take two steps forward and one step back, or vice versa. . . . There is some slow progress, but it is unclear as to whether or not that progress will lead to [the mother] making the actual changes that she needs to make in order to keep [N.W. and her baby brother] safe in her care.

The State petitioned to terminate parental rights. The termination hearing took place over several days in December and January 2026. The testimony supported the conclusion that the mother had not made the necessary progress to show she was able to provide a safe environment for the child. The department caseworker reported "[t]he current concerns are very similar to the concerns we had when we first got involved," including:

> [S]ituations here recently that have been very close to tiptoeing on whether or not physical abuse would have occurred if [the child] would have stayed in the home and not left the home by something that [the mother] had asked either the foster placement or another provider to come in to intervene.

For example, during a visit just prior to the hearing, the mother went to work and left the child and the younger child in the care of her boyfriend, who was asleep. This was especially troubling because the mother had reported earlier that month that the boyfriend had sexually assaulted her. The mother also struggled handling the child's challenging behaviors, leading to the mother needing help because she "was feeling overwhelmed." In addition, concerns remained about the stability of the mother's housing, transportation, and employment, and caseworkers learned that the mother failed to take care of the family dog, which eventually passed away in a kennel because of lack of access to food and water.

The department and GAL recommended termination, and the court entered an order terminating both parents' rights. Following our review of the record, we concur with the court that N.W. could not be safely returned to the mother's custody at the time of the termination hearing due to her lack of judgment and mental-health concerns, recurring safety issues while the child is in her care, and other facts replete in the record. Iowa Code section 232.116(1)(f) was satisfied.

## II. Best Interests

Termination also must serve the child's best interests. *See* Iowa Code § 232.116(2). The mother claims termination is not in N.W.'s best interests because "[n]ot only would she lose connection with her parents, she would lose a very special relationship she has with a toddler sibling." In a responsive brief on appeal, the GAL refutes the closeness of the sibling relationship.

N.W. has very challenging behaviors that "are undoubtedly caused by the trauma she has experienced." She has been removed from parental custody for over two years, with little improvement in the mother's parenting skills. Under these circumstances, we concur with the district court's determination that termination is in N.W.'s best interests.

## III. Family Unity

The mother claims the court "erred in terminating parental rights because the mother and child have a right to integrity of a family unit." The mother did not raise this claim before the district court. She "has accordingly failed to preserve this issue for our review and we decline to consider it." *In re B.W.*, No. 03-0576, 2003 WL 21231918, at *2 (Iowa Ct. App. May 29, 2003) (finding error not preserved on the father's due process claim because he did not raise it before the district court).

# FATHER'S APPEAL

## I. Best Interests

The father challenges the court's determination that termination of his parental rights is in the child's best interests. The father maintains that he "has never abused or neglected the Child" and the CINA case "was based solely on the actions of the Mother." The father states that he made as much as he could out of the limited contact he was allowed with the child and they have re-established a bond.

In assessing the best interests of N.W., we must look at her "long range as well as immediate interest[s]". *See In re K.F.*, 437 N.W.2d 559, 560 (Iowa 1989) (citation omitted). "This requires considering what the future holds for the child if returned to the parents." *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997). When making this decision, we look to the father's "past performance because it may indicate the quality of care [he] is capable of providing in the future." *Id.* The father had little contact with the child prior to the department's involvement. And for the majority of these proceedings, the father has been in prison or a halfway house. Even when he was not in prison, he failed to participate in mental-health or substance-use treatment. The father is a registered sex offender, and he was only approved to start interacting with the child in May 2025. At the time of the termination hearing, the child was five years old, and she had been removed from the parents' custody for two years. The foster family's adult daughter wished to adopt N.W. if parental rights were terminated. We conclude termination is in N.W.'s best interests.

## II. Additional Time

In passing, the father "asks the court to grant him a relatively short period of additional time to try to gain custody of his Child." The father

maintains he "is doing treatment and has gotten a job" while at the halfway house, and he should "be released within a few months and be available for placement." An extension of time is appropriate only if "the need for removal . . . will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). The court already granted the parents an extension in January 2025. The father remains on the sexual offender registry and has not completed sex offender treatment. There is no indication the father will be able to safely parent this child in the near future. We cannot find that additional time would result in removal of the child no longer existing at the end of the requested extension.

## DISPOSITION

We affirm the termination of both parents' parental rights.

**AFFIRMED ON BOTHAPPEALS.**

9