**IN THE COURT OF APPEALS OF IOWA**

No. 24-1616
Filed February 5, 2025

**IN THE INTEREST OF A.H-G.,**
**Minor Child,**

**V.W., Mother,**
    Appellant,

**N.G., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Brent Pattison, Judge.

A mother and father each appeal the termination of their parental rights to their son. **AFFIRMED ON BOTH APPEALS**.

Mark D. Reed of Marberry Law Firm, P.C., Urbandale, for appellant mother.

Leah Patton of Patton Legal Services, LLC, Ames, for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Erin E. Romar, Des Moines, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

A son was removed from his mother's custody in 2023 over concerns about her ability to care for him and her physical abuse of the son.[1]  Eventually even her supervised visitation had to stop because her behavior caused severe reactions during and after the visits by the son.  All the while, the son's father was incarcerated in Texas, as he had been for essentially the son's whole life.  So more than a year after the removal, the juvenile court found that the son could not safely return to either parent—at that time or after another six months—and terminated both parents' parental rights.  Each now separately appeals.

But on our de novo review, we agree with the juvenile court.  The State proved the statutory ground for terminating the mother's rights under Iowa Code section 232.116(1)(h) (2024)—especially given her testimony agreeing that the son could not yet return to her custody at the time of the termination hearing.  And termination of the mother's parental rights is in the son's best interest given the mother's failure to address the safety concerns that she poses to the son.

As for the father's appeal, we see no basis to find that the son could have been placed in his custody with another six months when it was uncertain that the father would even be released from prison and he agreed he would not be ready to care for the son upon release.  And we agree that termination is in the son's best interest, any parent-child bond does not warrant declining to terminate, and a guardianship is not appropriate here.  We thus affirm on both appeals.

---

[1] We avoid using the parties' names to respect their privacy because this opinion—unlike the juvenile court's order—is public.  *Compare* Iowa Code § 232.147(2) (2024), *with id.* §§ 602.4301(2), 602.5110.

## I.      Background Facts and Proceedings

In October 2022, a then-fifteen-month-old son came to the attention of the Iowa Department of Health and Human Services ("HHS") after he was seen alone on a balcony of a third-floor apartment, standing on a chair with his chest resting on the railing. The mother was not supervising him. In January 2023, concerns were again reported to HHS that the mother was not properly supervising the son. He suffered an electrical shock after getting her keys and sticking them in an unprotected electrical outlet. He also had other unsafe things, like safety pins and ink pen cartridges. And the mother failed to see why there was any need to be concerned for the son's safety. HHS tried to address the concerns informally by providing family-preservation services. But the mother became "belligerent" to the worker assisting her, and a child-in-need-of-assistance petition was filed in February 2023.

The son was adjudicated in need of assistance in April 2023. And the mother then agreed to work with HHS while he remained in her custody. But they soon lost their home and moved into Hope Ministries, a residential program, that same month. And before long, she was also asked to leave Hope Ministries because of "poor supervision" and "roughness" toward the son, "her aggression toward the other children in the program," and her unwillingness to work with program staff to improve her parenting skills. And so, the son was removed from her custody and placed with a foster family where he has remained since.

A permanency hearing was held over three days in January and February 2024. The evidence showed that the mother had "made very limited progress toward reunification" and was not cooperating with services being offered

to her.  Her visits remained professionally supervised because of safety concerns for the son.  When the son was diagnosed with Unspecified Trauma and Stressor Related Disorder, the mother was resistant to him receiving therapy.  And eventually, the juvenile court had to authorize HHS to sign consent forms for treatment because the mother would not do so.

Around the same time, visits between the mother and son stopped entirely at the recommendation of the son's therapist because they were causing the son to have severe behavioral reactions.  Once the visits ceased, his behavior greatly improved resulting in progress in play and speech therapy and less sleep problems.

The son's father has never met the son in person—though he has occasionally seen him over video calls or talked over the phone.  Since around the time of the son's birth,[2] the father has been incarcerated in Texas jail and prison for sexual assault of a child.  Once in prison, he could only have phone calls because the prison would not permit video calls without documentation that the son was not a victim, and the parties were never able to get that arranged or to get approval from the son's therapist.  The father remained in Texas prison at the time of the termination hearing.  But he hoped to soon start sex-offender treatment and then be paroled from prison in February 2025.

The State petitioned to terminate the parental rights of both parents, and a hearing was held on two separate days in June and August 2024.  Both the father

---

[2] The father testified that he had been incarcerated the son's entire life.  The jail records state that he was "booked" in July 2021, a few weeks after the son's birth.

and mother testified. The son's guardian ad litem recommended termination. And the juvenile court agreed, terminating the parental rights of both parents to the son.

In a thorough and well-reasoned decision, the court found that the State proved termination was warranted for both parents under Iowa Code section 232.116(1)(h). The court reasoned that the son was now three, had been adjudicated in need of assistance, had been removed from his parents care for over a year, "[a]nd there is no question he could not be returned to the custody of either parent at the time of the TPR hearing." The court also found that it was in the son's best interest for both parents' parental rights to be terminated. The court explained that the son "needs a long-term commitment from a parent to be appropriately nurturing, supportive of [his] growth and development, and who can meet his physical, mental, emotional and safety needs" and that "[n]either parent has demonstrated they are willing or able to fulfill this parental role."

The court declined both parents request for a six-month extension to work towards reunification because it could not "find that it is reasonably likely that either parent will be in a position to resume custody in the next six months" and the son "deserves permanency now." The court also rejected a guardianship as an appropriate permanency alternative, finding that "[a] guardianship would just lead to re-litigation of custody as soon as the case closes because neither [the mother] nor [father] recognize that it is not safe for [the son] to be in their care." And given the father's "incarceration through nearly all [the son's] life" and the son's "primary attachment" to the foster mother, the court could not find that termination of the father's rights "would be detrimental to [the son] in light of the closeness of the parent child relationship."

Both parents now separately appeal the juvenile court's order terminating their parental rights to the son.

## II.      The Mother's Appeal

Terminating parental rights under Iowa Code chapter 232 follows a three-step process. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).  First, the State must prove a statutory ground for termination.  *Id.*  Second, the State must show that termination is in the best interest of the child.  *Id.*  And finally, the parent bears the burden to show whether a discretionary exception applies that should preclude termination.  *Id.*  We review a termination decision de novo, giving "respectful consideration" to the juvenile court's fact findings, especially when based on credibility determinations.  *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).  On appeal, the mother challenges the juvenile court's rulings on the first two steps of this process: (1) whether the State proved the ground for termination under Iowa Code section 232.116(1)(h), and (2) whether termination is in the best interest of the son.

*Ground for Termination.*  The mother argues that the State failed to meet its burden to terminate her parental rights under Iowa Code section 232.116(1)(h), mainly because she was making progress "to provide for herself and for her child upon his expectant return" even though all visitation had stopped for about six months by the end of the termination hearing.  But we agree with the juvenile court that the State proved this ground for termination.

Termination is proper under section 232.116(1)(h) when a child is three years old or younger and has been adjudicated a child in need of assistance and removed from the physical custody of their parents for six of the last twelve months,

and "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the *present time.*" Iowa Code § 232.116(1)(h) (emphasis added); *see also In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (explaining that the issue is whether child could be returned "at the time of the hearing"). At the termination hearing, the mother conceded all these elements including that the son could not have been returned to her care at that time.

And we agree with the juvenile court that clear and convincing evidence beyond the mother's candid admission shows the son could not be returned to the mother at the time of the hearing. While she was making some efforts at progress, she was still struggling with addressing her mental-health issues and safe parenting skills. Not only had she not progressed past supervised visits, but they had to be stopped entirely because of the son's severe behavioral reactions. The juvenile court observed firsthand her challenges "regulating her emotions" during its proceedings. And she was considering living with a sex offender. The State proved this ground for termination.

*Best Interest of the Child.* The mother next challenges the second step— whether it is in the son's best interest to terminate her parental rights. In arguing that termination is not in the son's best interest, the mother essentially repackages the same arguments she made on the statutory ground, again contending that her "progress was not considered by the State." And again, we disagree.

The best interest of the child is the "paramount concern in a termination proceeding." *L.B.*, 970 N.W.2d at 313. We consider both the son's long-range and immediate best interests. *See In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997).

And we must give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016).

The safety concerns that prevented a return to the mother also show that termination is in the son's best interest. Plus, the son is well bonded with the foster family, which is committed to caring for his developmental needs. The son's therapist reported that his foster mom is his "safe base" and that he needs permanency in a home that can meet his needs. The therapist also reported that the son was progressing in his therapy sessions now that visits with the mother have ended. So too has he been sleeping and behaving better without any contact from the mother. Based on the son's physical, mental, and emotional needs, we agree with the juvenile court that it is in the son's best interest to terminate the mother's parental rights. We thus affirm the juvenile court's termination of the mother's parental rights.

### III.     The Father's Appeal

In his appeal, the father raises four issues. First, he argues that he should have been granted six more months for reunification. Second, he argues that termination of his parental rights is not in the son's best interest. Third, he argues that the court should have declined to terminate his rights because of the closeness of his relationship with the son. And fourth, he argues that the court should have established a guardianship as an alternative permanency outcome. We will take each issue in turn.

*Additional Time for Reunification*.  The father first argues that the juvenile court should have granted him six more months to work toward reunification rather than terminating his rights.  Juvenile courts may "deny termination and give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'"  *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)).  As with other issues within termination proceedings, our review is de novo.  *Id.* at 322.

The father remained incarcerated at the time of the termination hearing.  At the time of submitting written closing statements, the father noted that he had been "moved to a facility for completion of the sex offender treatment program" and that it is "reasonably likely" that he would be released on parole in the next six months.  But there was no assurance that the father would be released.  And even if it were certain, the father would not have been immediately ready to take custody of the son he had never met in person without having housing, employment, and care arrangements all prepared.  Even the father agreed at the hearing that "in six months [he] would not be able to be in a position to take care of [the son]."  We thus agree with the juvenile court that it is not "reasonably likely that [the father] will be in a position to resume custody in the next six months."  And we affirm the court's denial of the father's request for six more months.

*Best Interest of the Child.*  The father next contends that termination of his parental rights was not in the best interest of the son.  The father argues that he and the son "have a bond" and that even though he has been incarcerated, he "sincerely desires to retain a parental role in the child's life."  Still, we agree with the juvenile court that termination is in the son's long-term and immediate best

interest.  The father has been incarcerated for nearly all the son's life for sexually assaulting a child.  The son is doing "extremely well" in his foster placement.  HHS reported that the son "has become extremely attached to the [foster] family and continues to look to them for comfort when needed."  The son's physical, mental, and emotional needs will be best served by terminating the father's parental rights and letting the son achieve permanency with the family he knows.  We thus affirm the juvenile court's best-interest finding.

*Parent–Child Bond Exception.*  The father also argues that the court should have declined to terminate the father's rights because he and the son "have a relationship and bond."  *See* Iowa Code § 232.116(3)(c).  This exception is permissive, so even if the father and son have a close relationship, a court may still order termination when doing so would serve the child's best interest.  *See In re A.S.*, 906 N.W.2d 467, 475 (Iowa 2018).  And we agree with the juvenile court that there is no evidence here to find that the closeness of the parent–child relationship would make termination detrimental.  The father has been incarcerated for nearly all the son's life—indeed, he has never seen the son in person.  They have had only limited phone conversations, and none for some time.  The father has not met his burden to prove by clear and convincing evidence that his bond with the son should preclude termination of his parental rights.  We thus affirm the juvenile court's rejection of this exception.

*Guardianship.*  Finally, the father argues that the juvenile court should have considered guardianship as an alternative permanency option because a guardianship "would allow [the father] and the child to continue to have a relationship and would allow contact and visitation between [the father] and the

child." But "a guardianship is not a legally preferable alternative to termination." *Id.* at 477 (cleaned up). This is because over the life of the guardianship—potentially until the child turns eighteen—the court could terminate the guardianship or change the guardian at the father's request or on its own motion. *See id.* at 477–48. It sets up potential conflict between the guardian and the father. So it often does not "achieve permanency" and stability. *Id.* at 478 (cleaned up). While Iowa Code section 232.104 allows for guardianship as a permanency option, it requires "a judicial determination that [such a] planned permanent living arrangement is the best permanency plan for the child." Iowa Code § 232.104(3)(a).

We cannot say that guardianship is in the son's best interest rather than termination. The son's therapist has reported that his foster mom is his "safe base" and that he needs permanency in a home that can meet his needs. Because of the father's incarceration nearly for the son's whole life, they have only a limited relationship. The father presented no concrete plans for potential guardians for the son. And we agree with the juvenile court that "[a] guardianship would just lead to re-litigation of custody." The son needs and deserves permanency now. We thus affirm the juvenile court's termination of the father's parental rights.

**AFFIRMED ON BOTH APPEALS**.