# IN THE COURT OF APPEALS OF IOWA

―――――――――――

No. 26-0421
Filed June 24, 2026

―――――――――――

**In the Interest of C.P., I.P., I.P., S.P., and T.P., Minor Children,**

**B.E.P., Mother,**
Appellant,

**D.P., Father,**
Appellant.

―――――――――――

Appeal from the Iowa District Court for Appanoose County,
The Honorable Richelle Mahaffey, Judge.

―――――――――――

**AFFIRMED ON BOTH APPEALS**

―――――――――――

Debra A. George of Griffing and George Law Firm, PLC, Centerville,
attorney for appellant mother.

Jonathan Willier, Centerville, attorney for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Julie De Vries of De Vries Law Office, PLC, Centerville, attorney and
guardian ad litem for minor children.

―――――――――――

1

Considered without oral argument
by Greer, P.J., and Buller and Langholz, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

A mother and father separately appeal the termination of their parental rights to five children. Both parents argue the State failed to prove grounds for termination under Iowa Code section 232.116(1)(e) (2025); termination is not in the children's best interests; exceptions apply to prevent termination; and the juvenile court should have established a guardianship in lieu of termination. On our review, we affirm the termination of the mother's and father's parental rights.

### I. Background Facts and Proceedings.

The mother and father are the parents of five children (hereinafter "the children"), born in 2017, 2018, 2020, 2021, and 2023. The mother also has six other children: two adults; three children who are in a guardianship with the maternal grandmother, Brittany;[1] and one child whose case is still pending before the juvenile court. The family has a long history of involvement with the Iowa Department of Health and Human Services (HHS), primarily due to concerns about the parents' domestic violence, mental health, substance use, and housing instability.

In February 2024, HHS again became involved with the family after receiving a report that the mother assaulted the father in front of the children. The mother was arrested, and a no-contact order (NCO) was entered between the mother and father on February 13. The mother violated the NCO the next day and again assaulted the father, resulting in another arrest. There was an NCO between the parents for the duration of this case. The

---

[1] To maintain confidentiality, we have used a random-name generator to replace real names in this opinion with fictitious names.

mother's assault of the father resulted in a founded child-abuse assessment against her.

During HHS's investigation, the father reported that the mother was struggling with her mental health and exhibiting paranoid behaviors, including covering objects in their home that she believed to be cameras. It was also alleged that the mother assaulted Brittany, and the social worker observed injuries to Brittany's face consistent with the allegation. Around this same time, the father and Brittany applied to have the mother civilly committed for her mental health. The mother was involuntarily hospitalized for seven days.

At this time, neither parent had a job, although the father was in the process of applying for Social Security benefits due to a disability. Before the NCO, the family was living in a home owned by the mother's ex-husband (hereinafter the "family home"). The parents did not pay the mortgage but did pay some utilities. The family home had several issues, and the condition of the home deteriorated throughout this case. The home was next door to the children's maternal great-grandparents' house. The great-grandmother, Jodie, often helped with the children. After the NCO, the father remained in the family home, and the mother began living with Brittany; the parents split time with the children.

On April 23, the State filed a petition to have the children adjudicated children in need of assistance (CINA). After the parents refused to participate in services, the State applied to have the court remove the children from the parents' custody.

On May 20 and 29, the juvenile court held a contested adjudication and removal hearing. Both parents denied that there were any issues and

refused all services.  The father did agree, however, that he "had a slip-up here and there" and used methamphetamine over the past year despite having a heart condition that could be fatal with continued methamphetamine use.  On May 29, the court adjudicated the children CINA but did not remove them from their parents' custody at that time.

After the CINA adjudication, HHS continued to encourage the parents to participate in services, primarily mental-health and substance-use treatment.  Family-Centered Services (FCS) provided additional support to the parents and supervised their visits with the children.  The father admitted he needed mental-health therapy but said he was not ready.  The mother declined mental-health and substance-use treatment, although the HHS social worker noted that the mother's behavior "mimicked when she was using methamphetamine in the past."

In mid-July, HHS determined that a safety plan was necessary after one of the children reported that the mother had hit him, thrown things, and broken a mirror at Brittany's house.  The safety plan allowed the children to remain in the parents' custody so long as Brittany or other family members supervised the mother's interactions with the children.

Despite the safety plan, issues persisted.  Concerns arose that the mother was running out of her prescription medication early and behaving erratically.  The mother refused to show the HHS social worker her prescription and would not provide any medical information or documentation.  Around this same time, the father reported he was no longer living at the family home due to black mold.  The father had nowhere else to live.  He told HHS the home would likely go into foreclosure.

On August 1, the HHS social worker and FCS worker made an unannounced visit to see the mother. During this visit, the mother left one of her pills unattended on a kitchen table, accessible to the children; one of the children gave the FCS worker an open container of razor blades; and the social worker witnessed one of the children go outside and get into a baby pool without the mother's knowledge. The mother refused to participate in additional safety planning, so the State filed an ex-parte application to remove the children from their parents' custody. The court entered the removal order on August 2, and the children were placed in Brittany's care.

On August 8, the family home was condemned due to poor living conditions. The next day, the mother was found in the family home and arrested for violating the NCO.

The mother's erratic behavior continued, and the HHS social worker talked with Brittany and Jodie several times about not letting the mother have unsupervised contact with the children. According to Jodie, the mother did not listen to them and would sneak into their homes without their knowledge. On one occasion, one of the children let the mother in after she threatened to break a window.

On August 24, Brittany reported that the mother had written a suicide note, which was found by one of the mother's older children not at issue in this case. A few days later, the father reported that the mother had threatened to kill the children. Police were called in both instances.

On August 26, the father was arrested for driving while barred. Several days later, during one of the father's visits with the children at Brittany's home, one of the children found a syringe, which later tested positive for methamphetamine, under the deck. Before an adult could take the syringe,

the child poked one of the other children with the needle. The child who found the syringe told a family member that he had seen the mother and father together on the deck and the father had a needle in his hand. Both parents refused drug testing. On September 2, both parents were arrested for violating the NCO.

On September 6, after a contested hearing, the court entered a dispositional order, concluding that continued removal of the children was necessary. In the order, the court noted, "The original concerns [that brought the family to HHS attention] . . . have not begun to be addressed, and ostensibly, progress has backslid for the family." The court cautioned the mother "to start taking the recommendations of HHS seriously" and cooperate with services because "[c]ontinuing to deny that services are needed flies in the face of the evidence that numerous, serious safety concerns persist." The court reiterated: "Progress toward reunification will be stymied until the parents acknowledge their need for mental health treatment, substance abuse treatment, domestic violence services, and safe and stable housing." Neither parent requested different or additional services.

Despite the court's directive, the parents continued to refuse to participate in services. By this point, the father had begun showing behavioral indicators of substance use. The mother was again involuntarily committed for her mental health until it was deemed that she was not "seriously mentally impaired" as defined in the Iowa Code. The involuntary commitment case was dismissed on September 24.

In addition to the mental-health and substance-use concerns, both parents struggled with providing adequate care and supervision for the children during visits. During several visits, the mother left children

unsupervised. During one visit, she slapped one of the children in the chest when he was not listening to her. The HHS social worker noted, "It is clear it is difficult for [the mother] to keep track of all the children." For his part, the father would typically do well during the first hour of visits, but he had a hard time providing consistent attention to all the children, and he would often lie on the floor during visits. The FCS worker present would direct the father to get up and interact with the children. The father often struggled to discipline the children, sometimes giving up and sometimes becoming frustrated and yelling. During one visit, the father struck one of the children on the arm because she was not responding to redirection. During the same visit, another child was running around with a knife, and the father did not notice until the FCS worker brought it to his attention. In another visit, while holding two of the children, the father pulled out a large hunting knife to open popsicles.

On October 11, the parents were arrested for violating the NCO. Both parents missed their October 12 visits due to being in jail.

On October 22, the mother was arrested for failing to vacate the condemned family home. Four days later, the mother threatened to kill Brittany and then herself. The mother then went to Jodie's house, grabbed a butcher knife, and went back to the family home, again threatening to harm herself. Jodie called the police to do a welfare check on the mother.

On November 1, the mother was arrested for failing to appear on the domestic-abuse-assault charge. She missed a visit the next day due to being in jail.

During the father's November 2 visit, he told two of the children to go away because his conversation with one of the other children was more

8

important. During this same visit, the father became verbally aggressive toward a child not at issue in this appeal, pointed to the FCS workers and said, "I don't care if they are here, I'm going to spank your ass, and they can't stop me."

On November 11, the father informed the FCS worker that his application for disability benefits had been denied. During this conversation, the father expressed suicidal thoughts and would not disclose his location. The FCS worker called the police to perform a welfare check. On November 12, the father was arrested for failing to appear for a hearing on the NCO violation.

On November 14, Brittany reported that the mother had physically assaulted her with the children present, and she might need surgery to repair an injury she sustained. The mother was criminally charged after this assault. The children confirmed to the HHS social worker that the assault happened, it scared them, and they all cried. One of the children stated he did not want to participate in visits with his mother anymore. The mother denied that the assault happened.

On November 20, the father disclosed that he was providing methamphetamine to the mother but denied using it himself. Around this same time, Jodie reported that the mother frequently showed up uninvited when the children were home despite being told not to. Jodie and her husband began locking the doors to keep the mother out of the home, but she continued to sneak in without their knowledge. Brittany reported that the parents continued to live together in the condemned family home in violation of the NCO. The back deck of the family home was covered in garbage,

broken glass, and broken furniture, and there were large pieces of broken glass in the yard.[2]

On December 11, during a visit to Jodie's home, an FCS worker saw the mother next door at the family home. The FCS worker went over to the family home and found the father trying to fix a broken window. The father denied the mother was there, stating he did not violate the NCO. The father watched the worker as they left, appearing to act as a lookout for the mother.

On December 28, during a supervised visit, the mother threatened one of the children, saying she would "beat [him] to a bloody pulp." After this interaction, the child went to the bathroom and vomited.

On January 30, 2025, the court held a dispositional review hearing and entered an order concluding that continued removal of the children was necessary based on the parents' failure to address their mental-health and substance-use concerns and due to their lack of stable housing. Again, neither parent requested different or additional services.

In February, the father told the HHS social worker that the mother accused him of injecting her with drugs, which he denied. The father did admit, however, to having used methamphetamine within the last ninety days. The father reported that due to having missed so many mental-health therapy appointments in the past, he was on a call-in list but had not been able to be seen. The social worker encouraged the father to look for a new therapist, but the father refused.

---

[2] In the meantime, the parents appealed the adjudicatory and dispositional orders in the CINA proceedings. A panel of our court affirmed. *See In re A.G.*, No. 24-1507, 2024 WL 4966120, at *1 (Iowa Ct. App. Dec. 4, 2024).

The father's disability benefits were approved in March, but he would not start receiving the payments until September. The father disclosed that he had used methamphetamine approximately one month earlier and admitted he was struggling with his mental health. He admitted that he saw the mother every day for a few hours and that he had given her money. By the father's report, the mother had gotten worse.

On March 15, the mother participated in a supervised visit but was unable to deescalate the children's fighting, instead yelling at the children or ignoring problems. The mother eventually had a "meltdown," during which she stormed out of the visit, yelling and throwing things on the ground. The FCS worker had to step in and redirect the children.

On March 20, the HHS social worker went to the family home, saw that the back door was halfway open, and encountered the mother, who reported she was not doing well. The social worker observed open sores on the mother's face. The social worker asked the mother if she needed anything, but the mother said no. The next day, the mother reached out to the social worker via text from Brittany's phone asking if the social worker could get the mother's Medicaid reinstated because she needed to pick up medications. The social worker replied asking if the mother had applied for Medicaid. The mother did not respond.

On March 25, Brittany informed the social worker that the city had removed the mother from the condemned family home and she had nowhere to go. The mother would not go to a shelter and refused to stay at a hotel, instead believing she could stay at Brittany's house. Brittany and Jodie would not allow the mother to stay with them, and no other family members were willing to house her due to her behavior. According to Brittany, the mother

had been "really bad lately," having mood swings. By March 31, the mother was staying with Jodie and refusing to leave.

Now almost a year out from the CINA adjudication on April 3, the court held another dispositional review hearing and entered an order the same day confirming that continued removal was necessary for the children's safety. The court noted that both parents continued to struggle with their mental health, substance use, and housing instability.

On April 24, Brittany reported that the mother had canceled the past three visits. The mother was still going to Jodie's home despite being told not to. Brittany believed that the mother had removed a board on the back door of the family home so that she could stay there. The social worker went to the condemned home to try to meet with the mother, but no one answered when she knocked. The social worker observed a board removed from the back door.

The following day, the mother was arrested for failing to appear for a pretrial conference in her assault case. She then pled guilty to a lesser charge of simple assault and was sentenced to thirty days in jail with all but two days suspended. The mother was placed on probation. The mother was also charged with failure to vacate a placarded dwelling, second offense.

On May 5, Brittany reported that she took the mother to the emergency room after the mother said she and the children had bugs crawling all over them. Brittany would not let the mother be near the children, and Brittany hoped that the staff at the emergency room would commit her. The next day, the mother was arrested for violating the NCO.

On May 23, the HHS social worker and FCS worker went to Jodie's house to meet with her, the children, and Brittany. The mother was also

there when they arrived. The mother reported that her recent lack of attendance at visits was due to health issues. During this conversation, the mother had a large bandage on her arm and had multiple healing wounds that appeared to have been picked at. The mother claimed she was living "here, there, and everywhere" but not at the family home. The mother was no longer taking her medication as her doctor had withheld it due to misuse. During the visit, the mother was unable to manage one of the children's behaviors and the social worker had to step in.

The next day, during the father's visit, he told the children he did not feel like playing, made no effort to stop a physical altercation between two of the children, cursed at the children, told them he was not going to come to visits anymore, and threw all of the snacks and water bottles in the trash. He then fell asleep on the floor until one of the FCS workers woke him up. During this same visit, one of the children complained of pain and the father offered him an unlabeled bag of pills. The father later claimed the pills were from Brittany and were over-the-counter pain medication.

During the mother's visit this same day, she struggled to manage the children's behaviors and made no effort to stop the children from damaging the playroom where the visit happened. The children damaged games and a wall and repeatedly kicked glass doors. One of the children kicked the FCS worker in the shins. This was the last FCS-supervised visit the mother participated in with the children.

By early June, the mother was staying with a friend and was inconsistently taking her medication. Brittany reported the mother had gotten "really bad," was using drugs, and frequently believed she had bugs in her body. The mother had cut herself beneath her elbow in an attempt to get the bugs out of her skin, had given herself a black eye from banging her head

on walls, and asked Brittany to cut her hand to get bugs out. According to Brittany, when the mother was around, she did not help with the children, instead showing up for food and then leaving. The FCS worker encouraged Brittany to call the police if the mother would not leave the home and reiterated that the mother was not to be around the children unsupervised.

After this, the mother was again civilly committed. On June 16, Brittany informed HHS that the mother's involuntary commitment had been court approved.

On June 19, the HHS social worker met with the father. The father reported that he no longer gave the mother drugs, but she was regularly using with another person. Since her committal, the mother had cut off communication with the father and Brittany, and he was unsure of her whereabouts. The father estimated he had last used drugs about a month earlier, admitting to relapsing when under stress. The father planned to set up mental-health therapy and substance-use treatment the following week, but he was concerned about the process taking too long.

On June 25, the HHS social worker went to Jodie's house and found the mother present. The mother said she had been "doing okay" since her release from the involuntary commitment and she was trying to apply for housing assistance but was having trouble with the application. The mother acknowledged that the case was approaching the permanency hearing, and that while she loved her children, she was unsure whether she would be able to care for them given her ongoing health issues.

On June 28, the father attended his visit for forty-five minutes until he said he felt sick, started cussing at everyone, and left. He did not interact with the children during this visit.

14

On July 17, the father had a substance-use evaluation. The father reported daily methamphetamine use over the past year, except for a period of sobriety in November or December. He had last used methamphetamine two days before his appointment. After this evaluation, the provider diagnosed the father with methamphetamine-use disorder, severe and chronic, and recommended extended outpatient treatment. The father attended substance-use counseling sessions on July 22 and 29. However, the father admitted to using methamphetamine on July 27.

As of July 24, the mother was coming and going from Brittany's house every day. The mother was hiding small packages of unknown substances in different places that were accessible to the children. The HHS social worker and FCS worker again spoke with Brittany and Jodie about boundary setting and not allowing the mother to be around the children unsupervised.

On August 9, the mother broke into Brittany's house, splashed blue paint around the kitchen, blocked the kitchen and bathroom sinks, and broke a mirror. The mother was located at the family home, covered in blue paint. She was arrested and charged with burglary, criminal mischief, and failure to vacate a placarded dwelling. The mother remained in jail, unable to bond out.

In early August, the father reestablished care with his mental-health therapist. On August 20 and 26, the father attended substance-use counseling. On August 27, the father met with his mental-health therapist. Around this time, the father secured a one-bedroom apartment. The HHS social worker described the apartment as "very small" and unable to accommodate the children.

Also on August 27, the State filed a petition to terminate the parents' rights to the children under Iowa Code sections 232.116(1)(e) and (h). However, due to the age of the children, only the youngest child met the age requirement for subsection (h). The State did not move to amend the petition at any time.

In September and October, the father met with his mental-health therapist four times and attended substance-use counseling eight times. He admitted to using methamphetamine on September 22 and October 7. Likewise, the father reported alcohol cravings and that he had last consumed alcohol on September 22, when he had ten to twelve shots of tequila. At the October 9 appointment, the father took a drug test, which showed presumptive positives for THC, amphetamine, and methamphetamine.

In late September, the HHS social worker met with the mother in jail. The mother expressed willingness to undergo substance-use and mental-health evaluations. However, when the social worker remarked that the mother looked better and that it must feel good to be sober, the mother responded that she had been sober for seven years and substances were not the issue. While in jail, Brittany provided the mother with money so that she could call the children. These interactions reportedly went well.

As of November 3, the father had secured a job working a couple days per week as a cook at a bar. He had begun having supervised visits at his apartment, where he cooked meals for the children. During these visits, the father "engage[d] well with the children and pa[id] attention to their needs." The father was working on making the apartment more comfortable for the children.

On November 4, the mother pleaded guilty to third-degree burglary as a habitual offender, third-degree criminal mischief, and credit card fraud under $1,500. Her sentencing hearing was scheduled for December 1. The following day, the mother underwent a substance-use evaluation, which recommended extended outpatient treatment.

The father attended substance-use counseling on November 6. He was unable to produce a urine sample for drug testing during this appointment.

By mid-November, the mother was out of jail. The father admitted that she had been staying at his apartment and that he had relapsed on methamphetamine. The father reported that, one night while she was at his apartment, the mother had cut herself in an attempted suicide. The father called for help, but the mother fled. The mother ended up staying in a shed on Brittany's property without Brittany's knowledge. The mother left a baggie of suspected methamphetamine in the shed. One of the children, while cleaning up the mother's blood in the shed, found the baggie and turned it over to Brittany, who turned it over to police. The mother was again arrested.

The juvenile court held the first day of the termination hearing on November 18. The mother was in jail at the time. The guardian ad litem and HHS social worker recommended termination of both parents' rights.

The HHS social worker assigned to this case was on medical leave in December and did not have contact with anyone in this case during that time. However, the FCS worker met with the father several times in December and attempted to meet with the mother.

17

On December 1, the father reportedly bailed the mother out of jail and let her stay at his apartment. Two days later, Brittany also reported the mother had been staying at the father's apartment, coming and going as she pleased. On December 6, the father canceled his visit with the children because the mother had "really screwed up his head," he was a "total mess," and did not want the children to see him like that. Around this same time, the father reported feeling depressed and smoking marijuana to cope.

On December 16, the FCS worker attempted to meet with the father at his apartment. When the FCS worker knocked, he encountered the mother, who said the father was at work. The worker noticed a young man in the apartment and smoke filling the living room. The worker set a time to meet with the mother on December 18. The mother did not attend the meeting. The mother was arrested on January 8, 2026 for a probation violation.

On January 28, the father tested negative for all illegal substances. The next day, the father met with the HHS social worker, reporting that he regularly met with his substance-use counselor but did not participate in drug testing until the day earlier. He claimed he had maintained his sobriety since a relapse in December and continued to participate in mental-health counseling.

On January 29, the HHS social worker met with the mother in jail. The mother refused to participate in a drug test. While the mother was in jail, Brittany again provided her money so that she could speak with the children on the phone.

On February 13, the juvenile court held the second day of the termination trial. The mother remained in jail. Both the mother and father

testified at this hearing.  The mother testified that she was almost forty-one years old.  Before her most-recent arrest, the mother was living in a shed in Brittany's backyard.  The shed did not have a bathroom or running water.  Brittany later testified that she was unaware that the mother was living in the shed.  The mother maintained that she had not used methamphetamine since 2019 and denied that she had tried to harm herself or had a mental-health episode in November 2025.

The father testified that he was fifty-five years old.  He continued to participate in mental-health and substance-use therapy, and his last date of use of methamphetamine was in December 2025.  The father continued to participate in supervised visits with the children.  He was still living in his apartment and working a couple days per week at the bar.  He continued to receive disability benefits and had recently applied to get benefits for the children.

On February 20, the juvenile court terminated the parents' rights to all of the children under Iowa Code section 232.116(1)(e) and as to the youngest child under subsection (h).  The parents appeal.

## II.  Standard of Review.

We review the juvenile court's decision to terminate parental rights de novo.  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).  "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses."  *Id.* (citation omitted).  "We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116."  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  "Evidence is clear and convincing

when there are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.* (cleaned up).

### III. Analysis.

We apply a three-step analysis to termination-of-parental-rights cases. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). First, we consider whether the State proved a ground for termination under Iowa Code section 232.116(1). *Id.* If the State has proved a ground for termination, we next consider whether termination of parental rights is in the children's best interests under section 232.116(2). *Id.* at 219–20. Finally, if "the statutory best-interest framework supports termination of parental rights, we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* at 220.

Both the mother and father challenge all three steps in the analysis. We first address the mother's appeal, then the father's.

**A. Mother's Appeal.** The mother's parental rights to all five children were terminated under Iowa Code section 232.116(1)(e), and her rights to the youngest child were also terminated under subsection (h). The mother argues the State failed to prove termination was proper under subsection (e), that termination is not in the children's best interests, and that exceptions to termination apply. We consider each argument in turn.

1. *Statutory grounds for termination.* "When a juvenile court terminates parental rights on multiple statutory grounds, we only need to find that one of them supports termination." *In re N.F.*, No. 24-1328, 2024 WL 4620790, at *3 (Iowa Ct. App. Oct. 30, 2024). Because we determine that the State proved grounds for termination of the mother's parental rights

under Iowa Code section 232.116(1)(e), we need not address the termination of her rights to the youngest child under subsection (h).

Under subsection (e), termination of a parent's rights is appropriate if the State proves: (1) the children have been adjudicated CINA; (2) the children have been removed from the parent's custody "for a period of at least six consecutive months"; and (3) "[t]here is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child[ren] during the previous six consecutive months and have made no reasonable efforts to resume care of the child[ren] despite being given the opportunity to do so." Iowa Code § 232.116(1)(e).

The mother challenges only the third element. The third element requires the State to show: "the parents (1) have not maintained significant and meaningful contact with the child during the previous six consecutive months and (2) have made no reasonable efforts to resume care of the child despite being given the opportunity to do so." *In re T.S.*, 868 N.W.2d 425, 437 (Iowa Ct. App. 2015), *as amended* (Oct. 16, 2015) (cleaned up). "The two requirements of subparagraph (e)(3) are clearly in the conjunctive: connected, joined together. Each is separately required, but they are considered closely interconnected." *Id.*

> The statute defines "significant and meaningful contact" as including:
>
> the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child[ren], a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child[ren], and requires that the parents establish and maintain a place of importance in the child[ren]'s li[ves].

Iowa Code § 232.116(1)(e)(3).

"While attending regular visits does lend support for a finding of significant and meaningful contact, this is not the only factor." *N.F.*, 2024 WL 4620790, at *4. "There must also be evidence of the 'affirmative assumption' of the duties that go with being a parent." *Id.* Included in this consideration is whether the parent has made "a genuine effort to complete the responsibilities prescribed in the case permanency plan." Iowa Code § 232.116(e)(3). Making this determination often "requires a qualitative analysis of [the parent's] efforts." *T.S.*, 868 N.W.2d at 438.

The mother argues that she maintained significant and meaningful contact with the children because she frequently saw the children at Brittany's and Jodie's houses without HHS or FCS involved. The mother also regularly spoke with the children while she was in jail. The mother claims she "made a genuine effort to complete the responsibilities prescribed in the case permanency plan" because she had started mental-health medication and completed a substance-use evaluation in jail.

We find the mother's arguments unconvincing. While the mother may have been able to see and talk to the children whenever she wanted, she did not maintain "significant and meaningful contact" with the children as it is defined under section 232.116(1)(e)(3). At the termination hearing, the HHS social worker reported that the mother was offered fifty supervised visits with the children. Of those visits, the mother attended seventeen. Two additional visits were partially attended due to the mother being late. One visit was canceled due to weather. The mother missed, no-showed, refused, or canceled thirty visits. Of the supervised visits the mother attended, concerns about the mother's behavior toward and supervision of the children were noted several times. The mother last attended a supervised visit with FCS on May 24, 2025.

22

Regarding the unsanctioned visits the mother had with the children, she often showed up unannounced and uninvited when it was convenient for her. As Brittany reported, the mother "would be there, and then all the sudden she would be gone," sometimes disappearing for days, only to "show up for a few hours and play with the kids, and then she would be gone. So it's nothing that's been steady or what a normal parenting help-out thing would be."

Further, and importantly, apart from visits with the children, the State showed by clear and convincing evidence that the mother had not made the "affirmative assumption . . . of the duties encompassed by the role of being a parent," including "a genuine effort to complete the responsibilities prescribed in the case permanency plan." Iowa Code § 232.116(1)(e)(3). The State also showed by clear and convincing evidence that the mother had "made no reasonable efforts to resume care of the child[ren] despite being given the opportunity to do so." *Id.* The concerns about the family that brought them to HHS attention—domestic violence, substance use, environmental hazards, lack of supervision, mental health and volatile behavior, and noncompliance with services—remain concerns about the mother. Throughout the life of this case, the mother repeatedly refused to participate in services and meet with HHS and FCS workers. By the time of the termination hearing in November 2025 and February 2026, the mother was in and out of jail, noncompliant with drug testing requests, unemployed, unhoused, and not participating in mental-health counseling or substance-use treatment. The mother continued to deny that she had ever relapsed on methamphetamine, claiming she had been sober since December 2019. She also downplayed her involuntary committals, denied that she had a mental-health episode in November 2025, and claimed she had no mental-health concerns. The mother appears to be unwilling or unable to accept that she

23

needs help, which has prevented her from making any positive changes to be a safe and stable caregiver for these children.

We conclude the State proved grounds for termination of the mother's parental rights to all five children under Iowa Code section 232.116(1)(e). We next consider whether termination of the mother's parental rights is in the children's best interests.

2. *Best interests.* When considering the children's best interests we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." *Id.* § 232.116(2). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010).

When determining the children's best interests, we "consider[] what the future holds for the child[ren] if returned to the parents." *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997). "When making this decision, we look to the parents' past performance because it may indicate the quality of the care the parent is capable of providing in the future." *Id.*; *see also In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994) ("We gain insight into the child[ren]'s prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities.").

These children have been in limbo for over two years. They have done well in their current placement, and they deserve the safety, stability, and permanency that they will only achieve through termination of parental

24

rights. As the juvenile court noted, the mother's "severe mental health concerns, methamphetamine use, violence and ongoing instability present a serious danger to the children," while "[t]he children are loved and well cared for by [Brittany]." We agree with the juvenile court and conclude termination of the mother's parental rights is in the children's best interests. We next consider whether any exceptions apply to prevent termination.

3. *Exceptions to termination.* Once we conclude the State has proven a ground for termination, a parent resisting termination has the burden to prove whether any exceptions to termination apply. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). "The exceptions in section 232.116(3) are permissive, not mandatory." *In re W.T.*, 967 N.W.2d 315, 324 (Iowa 2021) (cleaned up). "The court may exercise its discretion in deciding whether to apply the factors in section 232.116(3) to save the parent-child relationship based on the unique circumstances of each case and the best interests of the children." *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). "[O]ur consideration must center on whether the child[ren] will be disadvantaged by termination, and whether the disadvantage overcomes [the mother's] inability to provide for [the children's] developing needs." *D.W.*, 791 N.W.2d at 709. As always, the children's best interests remain our primary consideration. *A.S.*, 906 N.W.2d at 475.

Here, the mother argues that the exception in section 232.116(3)(c) applies because termination would be detrimental to the children based on the closeness of the parent-child bond and that termination was not required under section 232.116(3)(a) because the children were in Brittany's care. Related to her second argument, the mother argues that the court should have established a guardianship in lieu of termination. We consider each exception in turn.

We conclude that the mother has failed to show by clear and convincing evidence that termination would be detrimental to the children due to the closeness of the parent-child bond. *See* Iowa Code § 232.116(3)(c). While it is clear the mother loves the children, and that the children love her, she has consistently shown she is unable to place the children's needs above her own. She has not made any progress toward addressing her mental health or substance use, and because of that, she has been an unstable figure in the children's lives for years. *D.W.*, 791 N.W.2d at 707 ("We do not gamble with the children's future by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (cleaned up)). Considering the best interests of the children, we decline to apply the permissive exception in Iowa Code section 232.116(3)(c).

Turning to the permissive exception in section 232.116(3)(a), the court need not terminate the parents' rights when "[a] relative has legal custody of the child." However, in this case, Brittany does not have legal custody of the children, HHS does. *See A.M.*, 843 N.W.2d at 113. For that reason, the exception in section 232.116(3)(a) does not apply.

In any event, we do not find that a guardianship is appropriate. "A guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (cleaned up). Guardianship is not preferable "because over the life of the guardianship—potentially until the children turn eighteen— the court could terminate the guardianship or change the guardian at the mother's request or on its own motion." *N.F.*, 2024 WL 4620790, at *6. A guardianship "sets up potential conflict between the guardian and the mother," and "often does not achieve permanency and stability." *Id.* (cleaned up). "The impermanent nature of guardianships denies children

26

the security and stability that a permanent home provides." *In re A.C.*, No. 23-0567, 2023 WL 3612382, at *2 (Iowa Ct. App. May 24, 2023).

HHS did not recommend a guardianship due to the age of the children and the concern about the potential financial burden it would place on Brittany, who was already taking care of several children. Brittany testified at the termination hearing that adoption was "the best solution" and she was not open to a guardianship. We decline to create a guardianship for these children.

Having concluded that the State proved a ground for termination, termination is in the children's best interests, and that no exceptions to termination apply, we affirm the juvenile court's termination order as it relates to the mother.

**B. Father's Appeal.** On appeal, the father argues: (1) the State failed to prove grounds for termination under section 232.116(1)(e) and (2) termination is not in the children's best interests. In making his second argument, the father argues that exceptions apply to prevent termination and that the court should have established a guardianship for the children with Brittany. We consider the father's arguments in turn.

1. *Statutory grounds for termination.* The father argues that the State failed to prove grounds for termination under section 232.116(1)(e). He concedes there was sufficient evidence to terminate his rights to the youngest child under subsection (h). Because we conclude there were grounds to terminate the father's parental rights under subsection (e), we need not consider termination under subsection (h). *See N.F.*, 2024 WL 4620790, at *3.

27

As noted above, evaluating whether the State proved grounds for termination under section 232.116(1)(e) requires a "qualitative analysis" of the parent's efforts, requiring us to "look at the substance of [the father's] conduct, not just the form." *See T.S.*, 868 N.W.2d at 438. Upon our review, even with recent progress the father made, we conclude that the State proved the grounds for termination under section 232.116(1)(e) by clear and convincing evidence. Specifically, the State proved that the father had "not maintained significant and meaningful contact with the child[ren]" and that he had not "made . . . reasonable efforts to resume care of the child[ren]." Iowa Code § 232.116(1)(e)(3).

First, regarding the father's significant and meaningful contact with the children, whether the State met its burden of proof on this requirement is somewhat of a closer call. The father participated in forty-four of the fifty supervised visits he was offered with the children. That said, the father's visits were not all successful. The father often became aggressive, frustrated, could not safely handle all of the children, and was often unable to deescalate the children's behaviors. The father missed two visits due to illness, and missed four others due to no-show, hospitalization, or incarceration.

Further, despite his struggles during visits, we recognize that the father had "turned it around quite a bit," was "more honest with his struggles," and had improved his "ability to parent the children" in the months leading up to the termination hearing. Even so, the issues that caused the most concern to HHS—substance use, mental health, and the parents' continued violation of the NCO—were still not resolved by the time of the termination hearing. Significantly, the father continued using methamphetamine in September, October, and November, despite his improved interactions with the children. In December 2025, between the

first and second termination hearing dates, the father canceled a visit with the children because, after he bailed the mother out of jail and allowed her to live at his apartment, he could not handle the visit because the mother "screwed up his head" and he did not want the children to see him in that state. He reported being a "total mess" and using marijuana to cope. He also reported relapsing on methamphetamine around the same time.

We conclude the father failed to make an "affirmative assumption . . . of the duties encompassed by the role of being a parent" and failed to make "a genuine effort to complete the responsibilities prescribed in the case permanency plan." Iowa Code § 232.116(1)(e)(3).

This leads us to the second requirement of section 232.116(1)(e)(3): that the father had not made reasonable efforts to resume care of the children. *Id.* We conclude that the State met its burden of proof to show this requirement by clear and convincing evidence.

We commend the father for the positive changes he made before the termination hearing. The father was approved to receive disability benefits, was working on obtaining benefits for the children, had found a one-bedroom apartment for himself, and was working two days per week as a cook at a local bar.

That said, his commitment to meaningful progress was a requirement and important to the goal of providing stability and permanency for the children. Despite HHS's longstanding involvement with this family, most recently beginning in February 2024, the father was resistant to services for almost a year and a half and did not begin attempting to address his substance-use and mental-health issues until a few months before the termination hearing. To his credit, the father began participating in

substance-use treatment in July 2025 and mental-health therapy in August 2025. At his July 2025 substance-use evaluation, however, the father admitted to daily methamphetamine use over the past year. Throughout his treatment he also reported nearly monthly relapses—in July, September, October, November, and December. We commend the father for continuing to attend treatment and express a commitment to his sobriety despite his relapses. However, given the amount of time that had passed in this case before the father got serious about his treatment, this participation in treatment is too little, too late.

As noted, even with his participation in these programs, the father continued to relapse on methamphetamine, had not meaningfully participated in random substance-use testing throughout the case, and sometimes blamed his positive drug tests on factors outside of his control, such as when he blamed a positive drug test on taking a hit of someone's vape, claiming he thought it was only nicotine. His decision to continue using methamphetamine is especially concerning given his heart condition, which could be fatal with continued methamphetamine use. Further, given the father's lack of participation in drug testing throughout the case, we are unable to verify more than short-term sobriety. The father also hindered his own progress by continuing to enable the mother's erratic behavior, staying in contact with her despite the NCO, bailing her out of jail, and letting her stay at his apartment despite his concerns that she was struggling with her mental health and sobriety. This behavior continued throughout the period between termination hearing dates.

In the end, we have significant concerns about the father's fragile sobriety, his mental health, and his poor boundaries with the mother, and we conclude that the State showed that, over the course of the case, the father

had not made a genuine effort to comply with the case permanency plan and had not made reasonable efforts to attempt to resume care of the children. We therefore affirm the juvenile court's ruling finding grounds to terminate the father's rights to all five children under section 232.116(1)(e).

2. *Best interests.* The father argues that termination is not in the children's best interests because the father is closely bonded with the children, and the children are closely bonded with each other. In making this argument, the father appears to allege that statutory exceptions to termination apply under section 232.116(3). Although he does not make a separate argument, we consider the statutory exceptions identified in his briefing in a separate subsection of this opinion.

We conclude that termination of the father's parental rights is in all five children's best interests. We do not doubt that the father loves the children and the children love him. However, as the juvenile court noted, the father's "extensive history of resuming methamphetamine use, and his inability to keep appropriate boundaries with [the mother] . . . pose a threat to the children's safety and wellbeing." The children deserve stability and cannot wait on the father's unpredictable path to recovery. *See A.S.*, 906 N.W.2d at 474 ("Children simply cannot wait for responsible parenting." (citation omitted)). Termination is in their best interests.

3. *Exceptions to termination.* In making his best-interests argument, the father cited statutory exceptions to termination under section 232.116(3)(a) and (c), arguing that termination is not necessary as a relative has legal custody of the children and the closeness of the parent-child bond precludes termination. As noted above, section 232.116(3)(a) does not apply because HHS, not Brittany, has legal custody of the children. In any event, for the same reasons we determined a guardianship is not appropriate in the

mother's appeal, we make the same determination as to the father. Establishing a guardianship is not in these children's best interests.

Finally, section 232.116(3)(c) provides that termination is not necessary when "[t]here is clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." Upon our de novo review of this record, we cannot say that the parent-child bond is so strong that termination would be detrimental to the children. These children have been waiting for stability and permanency for over two years. It is in their best interests that they finally have the opportunity to achieve both. For that reason, we decline to apply the permissive exception to termination under section 232.116(3)(c).

## IV. Conclusion.

We conclude that the State proved grounds to terminate the mother's and father's parental rights to all five children under Iowa Code section 232.116(1)(e); termination of the parent's parental rights to all children is in the children's best interests; and the parents failed to prove that any statutory exceptions apply to prevent termination. For that reason, we affirm the juvenile court's termination of the mother's and father's parental rights to all children.

**AFFIRMED ON BOTH APPEALS.**